## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

State of Missouri, David Mason, Andrea McCann, Jessica Fisher, and Phillip Fisher,

      *Plaintiffs*,

        v.

United States Department of Commerce, Howard W. Lutnick in his official capacity as Secretary of Commerce, United States Census Bureau, George Cook in his official capacity as Acting Director of the U.S. Census Bureau,

      *Defendants*.

Case No.

Three-Judge Panel Required Pursuant to 28 U.S.C. § 2284

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

### INTRODUCTION

1.    The third sentence of the Declaration of Independence summarizes the cornerstone of American political theory: "[T]o secure [unalienable] rights, Governments are instituted among Men, deriving their just powers *from the consent of the governed*." Declaration of Independence ¶ 2 (July 4, 1776) (emphasis added).  In America, the People—that is, the members of the social compact—are the only legitimate source of the government's power.  That is why James Madison said that "the people are the only legitimate fountain of power, and it is from them that the constitutional charter, under which the several branches of government hold their power, is derived." *The Federalist* No. 49 (Madison).  And that is why President Abraham Lincoln observed at Gettysburg

that ours is a "government of the people, by the people, for the people." President

Abraham Lincoln, *Gettysburg Address* (Nov. 19, 1863).

2.    In maintaining the American social compact between the People and their

government, nothing is more sacred than the People's right to representation.  After all,

the United States "is a representative form of government, and our legislatures are those

instruments of government elected directly by and directly representative of the people,

the right to elect legislators in a free and unimpaired fashion is a bedrock of our political

system." *Reynolds v. Sims*, 377 U.S. 533, 562 (1964); Junius Americanus (Arthur Lee),

*Boston Evening Post* (May 4, 1772) ("Representation . . . is Mr. Locke's doctrine, it is the

doctrine of reason and truth, and it is . . . the unvarnished doctrine of the Americans.").

3.    This case concerns whether the People still retain the right of self-

government—or whether aliens who trespass into the United States can hijack control

of our Republic's system of representation.

4.    Since the Carter Administration, the federal government has—with one

significant exception—intentionally counted illegal aliens as part of the Census and

included them in apportionment counts that determine how federal representation is

divided among the States.  To this day, the Census Bureau's website confirms that it will

continue to include "unauthorized immigrants" in the "resident population counts" for

the decennial Census and congressional apportionment.    U.S. Census Bureau,

*Congressional Apportionment / About / Frequently Asked Questions* (accessed Jan. 27,

2026);[1] *see also* U.S. Census Bureau, *Foreign-Born / About / Frequently Asked Questions* (accessed Jan. 27, 2026) ("The U.S. Census Bureau collects data from all foreign born who participate in its censuses and surveys, regardless of legal status. Thus, unauthorized migrants are implicitly included in the Census Bureau estimates of the total foreign-born population.").[2]

5.      This policy violates the U.S. Constitution and, indeed, basic principles of representative government. Section 2 of the Fourteenth Amendment requires that "Representatives shall be apportioned among the several States *according to their respective numbers*, counting the whole number of persons in each State, excluding Indians not taxed." U.S. Const. amend. XIV § 2 (emphasis added). This same rule—expressed with materially identical text—also governed when the Constitution was first ratified. *See* U.S. Const. art. I, § 2, cl. 3.

6.      At the time of the founding and the adoption of the Fourteenth Amendment, this language was understood to mandate the counting of all people *domiciled* in a State. *Infra* ¶¶ 106–145; *Franklin v. Massachusetts*, 505 U.S. 788, 804–05 (1992). That concept reached citizens and non-citizens *legally* permitted to remain indefinitely in the United States. As the Supreme Court explained in 1898, individuals could be deemed to have a "permanent domicile and residence" only "so long as they are *permitted* by the United States to reside here." *Wong Kim Ark v. United States*, 169 U.S. 649, 694, 705 (1898)

---

[1] https://www.census.gov/topics/public-sector/congressional-apportionment/about/faqs.html [https://perma.cc/KPK4-LK4W].

[2] https://www.census.gov/topics/population/foreign-born/about/faq.html [https://perma.cc/TG5S-R3EK].

(emphasis added); *accord Elkins v. Moreno*, 435 U.S. 647, 665 (1978) (temporary visa holders, such as non-citizens with student visas, cannot establish domicile in the United States); *Toll v. Moreno*, 458 U.S. 1, 14 n.20 (1982) (same); *Castellon-Contreras v. I.N.S.*, 45 F.3d 149, 153 (7th Cir. 1995) ("In order to have a 'lawful domicile,' then, an alien must have the ability, under the immigration laws, to form the intent to remain in the United States indefinitely. Thus, an alien who enters the country illegally cannot have a 'lawful' intent to remain here."). Only citizens and non-citizen individuals "permitted by the United States to reside here" and establish "a permanent domicile and residence," *Wong Kim Ark*, 169 U.S. at 694, 705—and not temporary visa holders or illegal aliens—were originally understood to be part of a State's "respective numbers" and "in each State," U.S. Const. amend. XIV § 2; *infra* ¶¶ 106–145.

7.    Consistent with that understanding, no Census has counted temporary sojourners such as foreigners "visiting the United States" for vacation on Census day. *See, e.g.*, Final 2020 Census Residence Criteria and Residence Situations, 83 Fed. Reg. 5525, 5533 (Feb. 8, 2018). Thus, there is broad agreement that the Constitution's reference to "whole number of persons" does not literally require counting every person who happens to be in a State when the Census is taken.

8.    Illegal aliens—non-citizens present in the United States without a lawful basis—should be treated the same as temporary sojourners. Temporary sojourners are allowed into the United States for business or vacation, but they are not allowed to remain here permanently, so they have never been counted in the Census. Like temporary sojourners, illegal aliens cannot be domiciled in a State because they have no

right to permanently remain where they are.  Illegal aliens are mere trespassers who "never" "enter[] the United States within the meaning of the law." *Kaplan v. Tod*, 267 U.S. 228, 231 (1925); *see id.* at 230 (noting that the illegal alien could not be deemed domiciled in United States "until she legally landed" inside the country); *Dep't of Homeland Sec. v. Thuraissigiam*, 591 U.S. 103, 139 (2020) ("[T]he alien is on U.S. soil, but the alien is not considered to have entered the country . . ."); *Leng May Ma v. Barber*, 357 U.S. 185, 188 (1958) (same).  Illegal aliens can be deported at any time—consistent with due process. *Thuraissigiam*, 591 U.S. at 139–40.

9.    Temporary visa holders, such as foreigners here on a student visa or a temporary work visa, are also like temporary sojourners.  "Congress expressly conditioned admission for [those] purposes on an intent not to abandon a foreign residence or, by implication, on an intent not to seek domicile in the United States." *Elkins*, 435 U.S. at 665; *see Toll*, 458 U.S. at 14 & n.20 ("Congress has precluded" certain aliens—including "foreign students" and "temporary workers"—from "establishing domicile in the United States."); *Carlson v. Reed*, 249 F.3d 876, 880–81 (9th Cir. 2001) (An alien whose "continued presence in this country would be illegal" "lacks the legal capacity to establish domicile in the United States."); *see also* 8 U.S.C. § 1011(a)(15). Thus, temporary visa holders should not be included in the decennial Census and apportionment.

10.    The framers of both the original Constitution and the Fourteenth Amendment did not intend—and the Constitution would not have been originally understood—to give temporary visa holders and illegal aliens *representation* in the federal government.  *Cf.*

5

*Wong Kim Ark*, 169 U.S. at 693 (noting that only foreign citizens "domiciled here" are "within the allegiance and the protection, and consequently subject to the jurisdiction, of the United States"). The framers intended to give representation to "unnaturalized" non-citizens—who were legally permitted to indefinitely remain in the United States—because, in large part, they expected those individuals to become citizens within a few years of their arrival. *See* CONG. GLOBE, 39th Cong., 1st Sess. 2987 (1866) ("Nearly all the men who come to this country are naturalized in five years.") (statement of Sen. Sherman); *id.* at 354 (statement of Rep. Kelley); *id.* at 356 (statement of Rep. Conkling). Today, the only non-citizens similarly situated to the non-citizens guaranteed representation by the Fourteenth Amendment are legal permanent residents—*i.e.*, foreigners who have immigrated to the United States with lawful intent to remain permanently, such as green-card holders. Illegal aliens and temporary visa holders cannot live here permanently, and they will not be permitted to vote within a concrete timeline. They are not members of the social compact, unlike citizens and legal permanent residents, who established domicile consistent with the Nation's laws.

11. For much of American history, whether illegal aliens would be counted in the Census and included in congressional apportionment was a mere academic question without practical importance. Indeed, "[t]he concept of illegal aliens was unknown to the Framers; there were no illegal aliens for nearly a century thereafter when the first act excluding certain aliens (prostitutes and convicts) was passed" in 1875. *Fed'n for Am. Immigr. Reform v. Klutznick*, 486 F. Supp. 564, 567 (D.D.C. 1980) (citing Act of March 3, 1875, 18 Stat. 477); *Kleindienst v. Mandel*, 408 U.S. 753, 761 (1972) ("Until

1875 alien migration to the United States was unrestricted.").  Also, Congress did not impose quotas on immigration until the Immigration Act of 1921.  *Kerry v. Din*, 576 U.S. 86, 96 (2015) (plurality opinion).  And even then, unauthorized border crossing did not become a crime until 1929.  Act of March 4, 1929, 45 Stat. 1551.  Because it was so easy to immigrate to the United States legally, very few migrants crossed the border illegally for most of the twentieth century.  Notably, the federal government appears to have only begun to seriously consider whether illegal immigrants could be counted in the 1980 Census.  And it was not until the 1980 Census that the Carter Administration affirmatively decided that illegal immigrants should be counted (hereafter the "Carter Administration Policy").

12.    That question, however, has taken on increased urgency in the past couple of decades as "at least 15 million people are in the United States illegally" and "[m]any millions illegally entered (or illegally overstayed) just in the last few years."  *Noem v. Vasquez Perdomo*, 146 S. Ct. 1, 1 (2025) (Kavanaugh, J., concurring in grant of application for stay).  Illegal immigrants now make up substantial percentages of the population for some American States—with California being the most notable example.

13.    Including illegal aliens in the decennial Census and apportionment has unlawfully inflated the representation of States like California and New York.  For example, in Los Angeles alone, there are "about 2 million" illegal aliens that make up "10 percent" of City's population.  *Id.*  For reference, the number of illegal aliens in Los Angeles is roughly equivalent to one-third of Missouri's population of 6.15 million people.  Perhaps unsurprisingly, given the fact they gain political power due to the presence of

more illegal aliens, States like California and New York now intentionally undermine federal authority by defending the interests of illegal aliens. *See, e.g.*, *Trump v. New York*, 592 U.S. 125 (2020) (New York arguing that illegal aliens have a right to representation in Congress); *City of San Jose v. Trump*, 497 F. Supp. 3d 680 (N.D. Cal. 2020) (California arguing that illegal aliens have a right to federal representation); *United States v. California*, 921 F.3d 865, 875 (9th Cir. 2019) (reviewing "three laws enacted by the California legislature with the express goal 'of protecting immigrants from an expected increase in federal immigration enforcement actions.'").

14.     Under the Supremacy Clause, U.S. Const. art. VI, it defies logic for States like California and New York to claim that illegal aliens are their domiciliaries and therefore part of "their respective numbers" for apportionment purposes. U.S. Const. amend. XIV, § 2. If federal law criminalizes entry of illegal aliens, 8 U.S.C. § 1325, California and New York cannot claim illegal aliens as "their" own. *See* U.S. Const. amend. XIV, § 2; *Toll*, 458 U.S. at 10 ("Our cases have long recognized the preeminent role of the Federal Government with respect to the regulation of aliens within our borders."); *Elkins*, 435 U.S. at 663 (noting the potential Supremacy Clause implications of federal immigration law's interaction with state domicile law).

15.     At the same time, the Carter Administration Policy diminishes the representation of States like Missouri, Ohio, West Virginia, and others who uphold federal immigration law. *See* Doc. 1-1, Kincaid Rpt.; Doc. 1-2, Trende Rpt. Because Missouri's population is made up almost exclusively of American citizens and legal permanent residents, the Carter Administration Policy has disadvantaged, and

8

continues to disadvantage, Missouri and its voters.  But for that Policy, Missouri would have gained a congressional seat (and an Electoral College vote) in 2020, and it will also gain a seat (and Electoral College vote) in 2030 if only citizens and legal permanent residents are counted.  *Infra* ¶¶ 64–75.  Stated more bluntly:  The Carter Administration Policy steals federal representation from Missourians, and transfers it to States who artificially inflate their population by harboring illegal aliens.

16.    The Carter Administration Policy also undermines intrastate redistricting. Article III, Sections 3 and 7 of the Missouri Constitution requires use of federal decennial Census population numbers for state legislative redistricting.  The inclusion of illegal aliens and temporary visa holders in the Census dilutes the representation of many Missourians vis-à-vis residents of counties with larger populations of illegal aliens and temporary visa holders.  *See Dep't of Com. v. U.S. House of Representatives*, 525 U.S. 316, 332–34 (1999) (Plaintiffs "established standing on the basis of the expected effects of the use of sampling in the 2000 census on intrastate redistricting.").

17.    The State of Missouri is also suffering monetary injuries under the Carter Administration Policy.  Many federal programs disburse money to the States based on their Census population numbers. The Census Bureau itself boasts that "[d]ata from the U.S. Census Bureau inform how trillions of dollars in federal funds are distributed each year," and "[a]t least 353 federal assistance programs used Census Bureau data to distribute federal funds in fiscal year 2021."  *See The Currency of Our Data: A Critical*

*Input Into Federal Funding*, U.S. Census Bureau (2023).[3]   Because the Carter Administration Policy unlawfully deflates Missouri's relative share of the relevant population, Missouri loses substantial amounts of federal funding every year.

18.   Enough is enough.   The Carter Administration Policy was and is unconstitutional.  It also violates the Administrative Procedure Act's prohibition against arbitrary decisionmaking, as there is no rational reason to give illegal aliens representation in the federal government.  Absent action by this Court, Missouri and its voters will continue to be injured by the Carter Administration Policy with respect to the 2020 Census and apportionment.  Missouri will also be injured through the 2030 Census and apportionment.

19.   The State of Missouri and its voters can no longer ignore the ongoing denial of their rightful representation in the federal government.   Unlike illegal aliens and temporary visa holders, Missouri's citizens and legal permanent residents are part of the "the People."  *See United States v. Verdugo-Urquidez*, 494 U.S. 259, 265 (1990); *United States v. Sitladeen*, 64 F.4th 978, 983 (8th Cir. 2023).   They have a right to representation.  Illegal aliens and temporary visa holders do not.  Temporary visa holders are not allowed to live here permanently, and they cannot vote.  And illegal aliens do "not become one of the people . . . by an attempt to enter, forbidden by law."  *U.S. ex rel. Turner v. Williams*, 194 U.S. 279, 292 (1904).

---

[3] https://www.census.gov/content/dam/Census/library/factsheets/2023/comm/factsheet-federal-funding.pdf [https://perma.cc/VAP6-89MU].

20.     Missouri therefore submits this Complaint and further alleges the following in support of its claims to relief:

<strong><u>PARTIES</u></strong>

21.     Plaintiff State of Missouri is a sovereign State of the United States of America. Missouri has a cognizable interest in its own right to representation in the House of Representatives and the Electoral College, which is integral to Missouri's power within the federal system.   Missouri also has a *parens patriae* interest in guarding fair and equitable representation for Missouri citizens in federal elections.   Furthermore, Missouri has an interest in lawful intrastate apportionments that comply with the State's own obligations under the Fourteenth Amendment and Article III, Sections 3 and 7 of the Missouri Constitution.   Finally, Missouri has a sovereign interest in fair apportionment of federal funding, which is awarded among the fifty States based on the population data from each decennial Census.

22.     Plaintiff David Mason is a former Commissioner and Chairman of the Federal Election Commission.  Mason is an American citizen who moved from Loudon County, Virginia to St. Louis County, Missouri on August 15, 2020.  Plaintiff Mason also became domiciled in Missouri on that day because he moved to Missouri with an intent to remain indefinitely.  Mason registered to vote in Missouri in early 2021.  He resides in Missouri's Second Congressional District, Missouri State House District 110, and Missouri State Senate District 15.  He intends to vote in every upcoming General Election (November 2026, 2028, 2030, 2032, and so on), and he intends to cast votes in the races for President of the United States, Missouri's Second Congressional District, Missouri State House

11

District 110, and Missouri State Senate District 15, among other races. *See* Doc. 1-3, Mason Decl.

23.     Plaintiff Andrea McCann is a naturalized American citizen who legally immigrated to the United States from Germany. McCann moved from Virginia to Franklin County, Missouri in August 2022. She also became domiciled in Missouri at that time because she moved to Missouri with an intent to remain indefinitely. McCann registered to vote in Missouri in the fall of 2022. She resides in Missouri's Second Congressional District, Missouri State House District 119, and Missouri State Senate District 26. She intends to vote in every upcoming General Election (November 2026, 2028, 2030, 2032, and so on), and she intends to cast votes in the races for President of the United States, Missouri's Second Congressional District, Missouri House District 119, and Missouri Senate District 26, among other races. *See* Doc. 1-4, McCann Decl.

24.     Plaintiffs Phillip and Jessica Fisher (the "Fishers") are business owners who reside in Cass County, Missouri. The Fishers are American citizens who moved from Johnson County, Kansas to Cass County, Missouri in August 2022. The Fishers also became domiciled in Missouri at that time because they moved to Missouri with an intent to remain indefinitely. The Fishers registered to vote in Missouri in the fall of 2022. They reside in Missouri's Fourth Congressional District, Missouri State House District 56, and Missouri State Senate District 31. They intend to vote in every upcoming General Election (November 2026, 2028, 2030, 2032, and so on), and they intend to cast votes in the races for President of the United States, Missouri's Fourth Congressional

District, Missouri House District 56, and Missouri Senate District 31, among other races. *See* Doc. 1-5, J. Fisher Decl.; Doc. 1-6, P. Fisher Decl.

25.     This Complaint collectively refers to Plaintiffs David Mason, Andrea McCann, Phillip Fisher, and Jessica Fisher as the "Individual Plaintiffs."

26.     Defendant United States Department of Commerce is a cabinet agency within the executive branch of the United States Government, and is an agency within the meaning of 5 U.S.C. § 552(f).  The Department of Commerce is tasked with planning, designing, and implementing the decennial Census, including the 2020 and 2030 Censuses.  13 U.S.C. §§ 4, 141(a).  Under 13 U.S.C. § 141(b), the Secretary of Commerce must transfer the Census tabulation to the President of the United States to assist with "the apportionment of Representatives in Congress."  The President, in turn, must transmit a tabulation to Congress for apportionment purposes.  2 U.S.C. § 2a(a).  The President's transmission must also include a statement about "the number of Representatives to which each State would be entitled under an apportionment."  *Id.*

27.     Defendant Howard W. Lutnick is the Secretary of Commerce.  He is sued in his official capacity.  Because of the Secretary of Commerce's involvement in the decennial Census and apportionment, *see* 13 U.S.C. § 141(b); 2 U.S.C. § 2a, the Supreme Court has repeatedly held that States may challenge the legality of the Census and apportionment through a suit in equity against the Secretary of Commerce.  *See Utah v. Evans*, 536 U.S. 452, 459–64 (2002); *Franklin*, 505 U.S. at 801–03.

28.    Defendant Census Bureau is an agency within, and under the jurisdiction of, the Department of Commerce. 13 U.S.C. § 2. The Census Bureau is the agency responsible for planning and administering the decennial Census.

29.    Defendant George Cook is the Acting Director of the Census Bureau.  He is sued in his official capacity.

### JURISDICTION, VENUE, AND THREE-JUDGE PANEL

30.    This Court has subject-matter jurisdiction under 28 U.S.C. §§ 1331 and 2201(a) because this action arises under Section 2 of the Fourteenth Amendment, Article I, Section 2 the U.S. Constitution, Article II, Section 1 the U.S. Constitution, and 5 U.S.C. § 706.  This Court also has jurisdiction under 5 U.S.C. §§ 702 and 704 and 28 U.S.C. § 1346(a).

31.    The Court has authority to review this case and to issue declaratory relief and injunctive relief pursuant to 28 U.S.C. §§ 2201 and 2202; 5 U.S.C. §§ 702, 704, and 706; 28 U.S.C. §§ 1361 and 1651; § 11 of the Judiciary Act of 1789, 1 Stat. 78; and the Court's inherent equitable authority.

32.    Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) and (e). Defendants are United States agencies and officers sued in their official capacities. Several Plaintiffs are residents of this judicial district and a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this district.  *See Sidney Coal Co. v. Soc. Sec. Admin.*, 427 F.3d 336, 345–46 (6th Cir. 2005) ("[T]he case law and legislative history compel this Court to hold that the residency requirement of 28 U.S.C.

14

§ 1391(e)(3)[4] is satisfied if at least one plaintiff resides in the district in which the action has been brought" and noting that this understanding "is the only view adopted by the federal courts since 1971." (collecting cases)).

33.    Plaintiff Missouri brings this action to redress harms to its proprietary interests, representational interests, informational interests, financial interests, sovereign interests, and to its interests *parens patriae*.

34.    The Individual Plaintiffs bring this action to redress harms to their representational interests.  The Carter Administration Policy dilutes the Individual Plaintiffs' votes and representation in both federal elections and state elections, which both rely on Census data for apportionment.  *See infra* ¶¶ 64–90.

35.    28 U.S.C. § 2284(a) requires a "district court of three judges [to] be convened" in this action because it involves "the constitutionality of the apportionment of congressional districts."  28 U.S.C. § 2284(a).

36.    Section 2284(b)(1) further provides that, "[u]pon the filing of a request for three judges, the judge to whom the request is presented shall, unless he determines that three judges are not required, immediately notify the chief judge of the circuit, who shall designate two other judges, at least one of whom shall be a circuit judge."  Plaintiffs therefore respectfully request notification of this action to be sent to the Chief Judge of the U.S. Court of Appeals for the Eighth Circuit and for the Chief Judge to designate a three-judge panel.

---

[4] 28 U.S.C. § 1391(e)(1)(C) was formerly codified as 28 U.S.C. § 1391(e)(3).

<u>FACTS COMMON TO ALL COUNTS</u>

**I.    The Constitution and federal law obligate the Defendants to fairly apportion representation according to each State's respective numbers.**

37.    The Apportionment Clause of the Fourteenth Amendment provides that "Representatives shall be apportioned among the several States according to their respective numbers, counting the whole number of persons in each State . . ." U.S. Const. amend. XIV, § 2.  The latter phrase—"whole number of persons in each State"—refers to citizens and legal permanent residents who are lawfully domiciled in the United States. The phrase does not encompass temporary visa holders, foreign adversaries, and illegal aliens who are present in a State.

38.    To make apportionment under the Fourteenth Amendment possible, Article I, Section 2 requires a decennial Census—an "actual Enumeration" of the number of "persons" in each state—conducted every ten years "in such manner as [Congress] shall by law direct." U.S. Const. art. I, § 2.  The central purpose of the decennial Census is to allow for fair apportionment of representation in Congress and the Electoral College among the fifty States during the decennial apportionment.  *See* U.S. Const. art. I, § 2, art. II, § 1.

39.    Since 1910, the House of Representatives has been fixed at 435 members.  *See* 2 U.S.C. § 2a(a).  Thus, every decennial apportionment is a zero-sum game—one State's gain is another State's loss.  The decennial Census is used to tabulate each State's population so that congressional representatives can be redistributed among the States based on their relative sizes.  The Census also directly effects the apportionment of presidential electors because a State's representation in the Electoral College depends

16

on the "Number of Senators and Representatives to which the State may be entitled in the Congress." U.S. Const. art. II, § 2.

40.    Accurate census data is vitally important to ensuring a fair redistribution. Indeed, "very small population differences can, and have, made a difference in apportionment.  In 1970, fewer than 300 people switched the 435th seat [in the House of Representatives] from Connecticut to Oklahoma.  Indeed, *one person* can make the difference."  *See* David C. Huckabee & Thomas M. Durbin, Cong. Rsch. Serv., *Apportionment of the House After the 1990 Census:  Constitutional and Practical Implications of Excluding Illegal Aliens — Testimony before the House Committees on Post Office and Civil Service* (June 24, 1988) (emphasis in original).

41.    Congress has delegated the responsibility to conduct the required decennial enumeration to the Secretary of Commerce.  Under the statute governing the conduct of the Census, the Secretary of Commerce "shall, in the year 1980 and every 10 years thereafter, take a decennial census of population as of the first day of April of such year." 13 U.S.C. § 141(a).  The statute further provides that "[t]he tabulation of total population by States under subsection (a) of this section as required for the apportionment of Representatives in Congress among the several States shall be completed within 9 months after the census date and reported by the Secretary to the President of the United States."  *Id.* § 141(b).

42.    After the decennial Census is conducted by the Census Bureau, the Secretary of Commerce reports the tabulation of the population of the States to the President.  13 U.S.C. § 141(b).  The President must then "transmit to the Congress a statement showing

17

the whole number of persons in each State excluding Indians not taxed, as ascertained under the . . . decennial census of the population, and the number of Representatives to which each State would be entitled under an apportionment of the then existing number of Representatives."  2 U.S.C. § 2a(a).  Under 2 U.S.C. § 2a(b), "[e]ach State shall be entitled . . . to the number of Representatives shown in the statement required by subsection (a) of this section, no State to receive less than one Member."

43.    Because of the Census's direct connection to the apportionment of federal representatives, States may challenge census practices that cause them to lose federal representation.  *See U.S. House of Representatives*, 525 U.S. at 332 ("There is undoubtedly a 'traceable' connection between the use of sampling in the decennial census and Indiana's expected loss of a Representative, and there is a substantial likelihood that the requested relief—a permanent injunction against the proposed uses of sampling in the census—will redress the alleged injury."); *Alabama v. U.S. Dep't of Commerce*, 396 F. Supp. 3d 1044, 1057 (N.D. Ala. 2019) ("[T]he Supreme Court has since clarified in no uncertain terms that states have standing to challenge census practices that cause them to lose a congressional seat, notwithstanding the statutory provisions that vest the President with the authority to issue the 'statement' that ultimately determines each state's congressional delegation." (citing *Utah*, 536 U.S. at 459–64)).

44.    Additionally, because of the Census's connection to the apportionment, the Individual Plaintiffs may challenge census practices that lead to their representational injuries in federal elections.  *See U.S. House of Representatives*, 525 U.S. at 330–32 ("Indiana resident Gary A. Hofmeister has standing to challenge the proposed census

18

2000 plan. . . . Hofmeister's expected loss of a Representative to the United States Congress undoubtedly satisfies the injury-in-fact requirement of Article III standing. In the context of apportionment, we have held that voters have standing to challenge an apportionment statute because 'they are asserting a plain, direct and adequate interest in maintaining the effectiveness of their votes.' . . . [Also,] [t]here is undoubtedly a 'traceable' connection between the use of sampling in the decennial census and Indiana's expected loss of a Representative, and there is a substantial likelihood that the requested relief—a permanent injunction against the proposed uses of sampling in the census—will redress the alleged injury." (quoting *Baker v. Carr*, 369 U.S. 186, 208 (1962))).

**II.  A Census Bureau Policy, first established in the Carter Administration, unlawfully requires including illegal aliens and temporary visa holders in the decennial Census and apportionment of representatives.  This policy has robbed—and will continue to rob—Missouri of fair representation in the House of Representatives and the Electoral College.**

45.    Section 2 of the Fourteenth Amendment—ratified in 1868—provides that "Representatives shall be apportioned among the several States according to their respective numbers, counting the whole number of persons in each State, excluding Indians not taxed."  U.S. Const. amend. XIV, § 2.  When the Fourteenth Amendment was enacted, the phrase "whole number of persons in each State" was commonly understood to refer to a State's *inhabitants*—meaning citizens and legal permanent residents who are lawfully domiciled in the State.  *Franklin*, 505 U.S. at 804–05.  That refers to more than "mere physical presence," and requires "allegiance or enduring tie" to the State.  *Id.* at 804.

19

46.    Although the framers of the Fourteenth Amendment contemplated that the decennial Census and apportionment would include legal permanent residents, no one imagined that *illegal* aliens would be included in the tabulation.  Indeed, the very "concept of illegal aliens was unknown" until 1875.  *Klutznick*, 486 F. Supp. at 567 (citing Act of March 3, 1875, 18 Stat. 477); *Mandel*, 408 U.S. at 761 ("Until 1875 alien migration to the United States was unrestricted.").  And even after 1875, federal law excluded only *certain* aliens, such as "convicts," "prostitutes," and "anarchists."  *Mandel*, 408 U.S. at 761.  Indeed, Congress did not impose quotas on immigration until the Immigration Act of 1921.  *Din*, 576 U.S. at 96 (plurality opinion).  And unauthorized border crossing did not become a crime until 1929.  *See* Act of March 4, 1929, 45 Stat. 1551.

47.    Unsurprisingly, for over a century following the Fourteenth Amendment's enactment, no branch of government seriously considered whether illegal aliens should be included in the decennial Census and apportionment.

48.    In fact, the federal government apparently did not even contemplate the issue until a 1940 debate in the House of Representatives.  *See* Cong. Rsch. Serv., *Constitutionality of Excluding Aliens from the Census for Apportionment and Redistricting Purposes*, at 13 (April 2012) (agreeing that "[e]arlier congressional debates apparently do not discuss unauthorized aliens, but rather consider the constitutionality and/or policy of excluding lawful aliens.").[5]  At that time, *one* Representative made a passing statement about whether illegal aliens should be included in the decennial

---

[5] https://www.everycrsreport.com/files/20120413_R41048_e4eb1c369b633cea5 2b254c5a305e6111eb5d795.pdf [https://perma.cc/2N93-HKDE].

Census and apportionment. 86 Cong. Rec. 4372 (April 11, 1940). But Congress has never enacted legislation resolving that question.

49.    And aside from this passing reference, no branch of government seriously considered the question of illegal aliens until the 1980 Census. *See* Dennis L. Murphy, *The Exclusion of Illegal Aliens from the Reapportionment Base: A Question of Representation*, 41 Case W. Res. L. Rev. 969, 972 (1991) ("The inclusion of illegal aliens in the reapportionment base has not been an issue until recently."); *1990 Census Procedures and Demographic Impact on the State of Michigan: Hearing Before the House Comm. on Post Office and Civil Service*, 100th Cong., 2nd Sess. 52–54 (1988) (statement of Daniel A. Stein) ("Prior to 1980, the inclusion of illegal aliens in reapportionment was not an issue since illegal immigration was minimal and the Census Bureau did not actively seek out illegal aliens for census participation."); *1980 Census: Counting Illegal Aliens: Hearing on S. 2366 Before the Subcomm. on Energy, Nuclear Proliferation and Federal Services of the Senate Comm. on Governmental Affairs*, 96th Cong. 62–63 (1980) (testimony of Census Bureau Director Vincent P. Barbara) (testifying that the Census Bureau had "no idea" "[h]ow many illegal aliens … were counted in the 1970 census" and that it was the Bureau's "assumption" was "that most [illegal aliens] were not included" in population estimates for determining the undercount of the 1970 Census).

50.    Indeed, "[b]efore 1980 illegal immigration was minimal and the Census Bureau did not seek out illegal aliens to be counted in the census." Murphy, *supra*, at 972. But once illegal immigration skyrocketed in the 1970s, the federal government was forced to consider whether illegal aliens should be included in the decennial Census and

apportionment tabulation. *Id.* The Carter Administration—with its delegated authority over the 1980 Census, *see* 2 U.S.C. § 2a; 13 U.S.C. 141—unilaterally decided to include illegal aliens in the Census and apportionment base. At the time, the Census Bureau even encouraged illegal aliens "to come forward and 'be counted'" in the 1980 Census. Murphy, *supra*, at 972. In 1985, the Director of the Census Bureau testified that, during the "1980 census," the Bureau "convinced the Immigration and Naturalization Service to curtail its law enforcement activities around census day" as part of a broader effort to encourage enumeration of illegal aliens. *Hearing on Enumeration of Undocumented Aliens in the Decennial Census Before the Subcomm. on Energy, Nuclear Proliferation, and Government Processes of the Senate Comm. on Government Affairs*, 99th Cong. 13 (1985) (testimony of Census Bureau Director John Keane) [hereafter "Testimony of Director Keane"].

51.    In response, six members of Congress from five States challenged the Carter Administration Policy. *See Klutznick*, 486 F. Supp. at 565 n.1. The Carter Administration tried to justify its policy by arguing that it was "constitutionally required to include all persons, including illegal aliens, in the apportionment base." *Id.* at 568. This was the first time that any branch of the federal government understood the Constitution to require inclusion of illegal aliens in the apportionment base. To this day, neither Congress nor the Supreme Court have taken a position on this question.

52.    The Carter Administration Policy caused immediate injury. After the 1980 Census, the Census Bureau itself released figures showing that "New York and California" likely gained additional representatives in Congress—while "Georgia and

Indiana" each lost a representative—because of "the over 2 million undocumented aliens" "included in the 1980 census." *See* Testimony of Director Keane, at 14–15. "[B]ecause of the 'sensitivity' of the issue," "[s]imilar figures were not calculated by the Census Bureau for the 1990 census." Charles Wood, *Losing Control of America's Future*, 22 Harv. J.L. & Pub. Pol'y 465, 470 (1999). But "[e]stimates from other experts indicate that the effect on the 1990 census was even greater: by one estimate California gained two congressmen, Texas gained one, and Kentucky, Massachusetts, and New Jersey each lost one." *Id.*

53.    Congress has repeatedly attempted to enact legislation correcting this problem. For example, after the 1980 Census, several Senators and Representatives introduced bills that would have excluded illegal aliens from the 1990 Census and apportionment tabulation.[6] Two of these measures succeeded in the Senate, which passed amendments to the Immigration Reform Act of 1989 and the Immigration Act of 1990 to exclude illegal aliens from the decennial Census and apportionment. *See* S. Amdt. 255, S. Amdt. 900, 101st Cong. (1989). The amendment to the 1989 Act withstood a point of order that it was unconstitutional by a margin of 56–43. *See* 135 Cong. Rec. S14539–S14554 (July 13, 1989).[7] And although the Immigration Reform Act of 1989 did not become law, the Senate approved a similar amendment to the Immigration Act of 1990, with many Senators citing the earlier vote about the constitutionality of such an

---

[6] *See, e.g.*, H.R. 744, 101st Cong., 1st Sess. (1989); H.R. 1468, 101st Cong., 1st Sess. (1989); H.R. 2661, 101st Cong., 1st Sess. (1989); H.R. J. Res. 199, 101st Cong., 1st Sess. (1989); S.358, 101st Cong., 1st Sess. (1989).

[7] https://www.congress.gov/101/crecb/1989/07/13/GPO-CRECB-1989-pt10-8-1.pdf.

amendment. 135 Cong. Rec. S22518–S22527 (Sept. 29, 1989); *id.* at S22519 (Statement of Sen. Shelby) ("A majority of the Senate, therefore, has affirmed that it is constitutionally proper to exclude [illegal aliens] from census figures for purposes of reapportionment . . .").[8]

54.    During these debates, several prominent Senators—including Senators Dole, Grassley, and Hatch—explained why a measure excluding illegal aliens was obviously constitutional under Section 2 of the Fourteenth Amendment. *See* 135 Cong. Rec. S14539–S14554 (July 13, 1989);[9] 135 Cong. Rec. S22518–S22527 (Sept. 29, 1989).[10] Senator Hatch offered an especially powerful defense: "There is no evidence to support the proposition that the constitutional language means, or was intended to mean, that the mere presence of a person within a State on the day of the census should necessarily result in such persons being counted as among 'the persons in' that State for purposes of determining the State's 'number' for apportionment. . . . No census has ever been conducted on the basis that every person physically present in the State on the day of the census is to be counted. There is strong evidence as to how the language has always been understood. Under the opponents' argument, foreign diplomats living on embassy grounds and foreign tourists would have to be counted. Carried through to its logical

---

[8] https://www.congress.gov/101/crecb/1989/09/29/GPO-CRECB-1989-pt16-3-1.pdf [https://perma.cc/9GM3-JMN3].

[9] https://www.congress.gov/101/crecb/1989/07/13/GPO-CRECB-1989-pt10-8-1.pdf.

[10] https://www.congress.gov/101/crecb/1989/09/29/GPO-CRECB-1989-pt16-3-1.pdf [https://perma.cc/9GM3-JMN3].

extent, an occupying army would qualify." 135 Cong. Rec. S22523 (Sept. 29, 1989) (Statement of Sen. Hatch).[11]

55.     Although the amendment excluding illegal aliens passed in the Senate, it was not included in the House's version of the bill. The amendment was ultimately dropped during reconciliation, which allowed the Carter Administration Policy to persist.

56.     Without intervention from Congress, the Carter Administration Policy has remained the executive branch's policy across the 1990 Census (H.W. Bush), the 2000 Census (Clinton), the 2010 Census (Obama), and the 2020 Census (Trump). The Census Bureau's website also confirms that the Carter Administration Policy remains effective for future Censuses. *See* U.S. Census Bureau, *Foreign-Born / About / Frequently Asked Questions* (accessed Jan. 27, 2026) ("The U.S. Census Bureau collects data from all foreign born who participate in its censuses and surveys, regardless of legal status. Thus, unauthorized migrants are implicitly included in the Census Bureau estimates of the total foreign-born population.");[12] U.S. Census Bureau, *Congressional Apportionment / About / Frequently Asked Questions* (accessed Jan. 27, 2026) (affirming that "unauthorized immigrants" are included in the "resident population counts" for purposes of the Census and congressional apportionment).[13]

---

[11] https://www.congress.gov/101/crecb/1989/09/29/GPO-CRECB-1989-pt16-3-1.pdf [https://perma.cc/9GM3-JMN3].

[12] https://www.census.gov/topics/population/foreign-born/about/faq.html [https://perma.cc/TG5S-R3EK].

[13] https://www.census.gov/topics/public-sector/congressional-apportionment/about/faqs.html [https://perma.cc/KPK4-LK4W].

57.     The executive branch's policy during the 2020 Census and the 2030 Census is of particular note to this action because it is the source of Missouri's ongoing and future injuries.  Both the 2020 Census and the 2030 Census are addressed below, starting with the 2020 Census.

58.     Before the 2020 Census, the Department of Commerce promulgated the Final 2020 Census Residence Criteria and Residence Situations, 83 Fed. Reg. 5525 (Feb. 8, 2018).  Keeping with the longstanding Carter Administration Policy, the 2020 Residence Criteria established that all "[c]itizens of foreign countries living in the United States" would be "[c]ounted at the U.S. residence where they live and sleep most of the time," regardless of whether they were illegal aliens or temporarily residing in the United States on a student visa or work visa.  *Id.* at 5533.

59.     Leading up to the 2020 Census, it was unclear what impact the 2020 Residence Criteria would have on the final Census tabulation and apportionment of representation for Missouri and its citizens.  Although the Trump Administration decided to include illegal aliens in the 2020 Census, the Administration took important steps to depart from the Carter Administration Policy.  First, the Trump Administration tried to include a citizenship question on the 2020 Census, which the Secretary of Commerce believed "could be useful in tackling problems related to national security and illegal immigration."  *Dep't of Com. v. New York*, 588 U.S. 752, 795 (2019) (Thomas, J., concurring in part and dissenting in part).  The Supreme Court affirmed the substantively validity of a citizenship question, but it struck the question because of

"unusual circumstances": The Court found that the citizenship question was not the product of reasoned decision-making. *Id.* at 785 (opinion of the Court).

60. However, even after *Department of Commerce v. New York*, it still appeared that Missouri might avoid an injury from illegal aliens being included in the decennial apportionment. Two weeks after the Supreme Court's decision, President Trump instructed executive departments and agencies to share information with the Department of Commerce that would allow the Secretary of Commerce to obtain accurate data on the number of citizens, non-citizens, and illegal aliens in the country. *See* Executive Order 13880, Collecting Information About Citizenship Status in Connection With the Decennial Census, 84 Fed. Reg. 33821 (July 11, 2019). At the time, the President and the Attorney General explained that the data on illegal aliens could be relevant for purposes of conducting the decennial apportionment under 13 U.S.C. § 141 and 2 U.S.C. § 2a.

61. Then, on July 21, 2020, the President issued a memorandum requiring the Secretary of Commerce to exclude illegal aliens from the decennial apportionment base even though illegal aliens were tabulated in the 2020 Census. *See* Presidential Memorandum, Excluding Illegal Aliens From the Apportionment Base Following the 2020 Census, 85 Fed. Reg. 44679 (July 21, 2020).

62. States like California and New York sued to enjoin implementation of this memorandum, and these States quickly secured nationwide injunctions against any implementation of the policy. *See City of San Jose v. Trump*, 497 F. Supp. 3d 680 (N.D. Cal. 2020); *New York v. Trump*, 485 F. Supp. 3d 422 (S.D.N.Y. 2020). The Supreme

Court later vacated all these injunctions. *See Trump v. New York*, 592 U.S. 125 (2020); *Trump v. City of San Jose*, 141 S. Ct. 1231 (2020). But the Court did not vacate the last injunction until December 28, 2020, *see San Jose*, 141 S. Ct. 1231—just three days before the January 1, 2021 deadline for the Secretary to transmit the apportionment tabulation to the President, *see* 13 U.S.C. § 141(b).

63. With the months-long nationwide injunctions against any implementation of the President's memorandum, the Secretary of Commerce was unable to complete the apportionment tabulation by the January 1, 2021 deadline under 13 U.S.C. § 141(b). That opened the door for the Biden Administration to reverse course when Biden entered office in January 2021.

64. On his first day in office, President Biden repealed President Trump's memorandum, and he issued an executive order unlawfully requiring the inclusion of illegal aliens in the apportionment base for federal representation. *See* Executive Order 13986, Ensuring a Lawful and Accurate Enumeration and Apportionment Pursuant to the Decennial Census, 86 Fed. Reg. 7015 (Jan. 20, 2021).[14] Under this executive order,

---

[14] President Trump, in turn, revoked the Biden Executive Order on January 20, 2025. *See* Executive Order 14148, Initial Rescissions of Harmful Executive Orders and Actions, 90 Fed. Reg. 8237 (Jan. 20, 2025). That new executive order, however, did not mandate reapportionment and it did nothing to undo or prospectively replace the longstanding Carter Administration Policy. *See id.* Indeed, the Census Bureau's website confirms the Carter Administration Policy remains in effect. *See* U.S. Census Bureau, *Foreign-Born / About / Frequently Asked Questions* (accessed Jan. 27, 2026), https://www.census.gov/topics/population/foreign-born/about/faq.html [https://perma.cc/TG5S-R3EK]; U.S. Census Bureau, *Congressional Apportionment / About / Frequently Asked Questions* (accessed Jan. 27, 2026), https://www.census.gov/topics/public-sector/congressional-apportionment/about/faqs.html [https://perma.cc/KPK4-LK4W].

the Secretary of Commerce transmitted an apportionment tabulation to the President

on April 26, 2021, that included illegal aliens and temporary visa holders in the

apportionment base. This unlawful tabulation produced an apportionment illustrated

by the following map, *see* Doc. 1-1, Kincaid Rpt. at 4:



65.    The above apportionment tabulation injured Missouri by denying it one

congressional seat and one electoral vote that it would have otherwise gained without

the inclusion of illegal aliens and temporary visa holders in the apportionment base. *See*

Doc. 1-1, Kincaid Rpt.; Doc. 1-2, Trende Rpt.  Indeed, Missouri's *two* retained experts

agree that if the executive branch included only citizens and legal permanent residents

in the 2020 Census and 2021 Apportionment, Missouri would have been awarded 9

congressional seats—but it instead only received 8.  Doc. 1-1, Kincaid Rpt.; Doc. 1-2,

Trende Rpt.  Missouri would have also held 11 electoral votes—instead it holds only 10.

The 2020 Census and 2021 Apportionment also robbed other States, including Ohio and

West Virginia.  Doc. 1-1, Kincaid Rpt.  Comparatively, States like California unlawfully

benefited.  California gained three more seats than it would otherwise hold if illegal

aliens and temporary visa holders had been excluded.  *Id.*  If the 2020 Census and 2021

Apportionment had included only citizens and lawful permanent residents, as the

Constitution requires, the 2021 apportionment would have adjusted as follows, *see* Doc.

1-1, Kincaid Rpt. at 11:



66.    Missouri's loss of a congressional seat and an electoral vote create Article III

standing for Missouri to challenge the legality of the 2020 Census and 2021

Apportionment.  *See Franklin*, 505 U.S. at 801–03; *Utah*, 536 U.S. at 459–64; *Alabama*,

396 F. Supp. 3d at 1057.  Indeed, the Supreme Court has repeatedly affirmed that States may advance post-Census and post-apportionment challenges to redress their injuries. For example, in *Franklin v. Massachusetts* and *Utah v. Evans*, both Utah and Massachusetts "brought their lawsuits after the census was complete.  Both claimed that the Census Bureau followed legally improper counting methods.  Both sought an injunction ordering the Secretary of Commerce to recalculate the numbers and recertify the official result.  Both reasonably believed that the Secretary's recertification, as a practical matter, would likely lead to a new, more favorable, apportionment of Representatives."  *Utah*, 536 U.S. at 460–61 (citing *Franklin*, 505 U.S. at 801–03).  In both cases, the Supreme Court held that Utah and Massachusetts had Article III standing.  *Utah*, 536 U.S. at 459–64; *Franklin*, 505 U.S. at 801–03.

67.    Missouri's losses of a congressional seat and electoral vote also create Article III standing for the Individual Plaintiffs to challenge to legality of the 2020 Census and 2021 Apportionment.  Plaintiff David Mason moved to Missouri in August 2020.  And Plaintiffs Andrea McCann, Phillip Fisher, and Jessica Fisher moved to Missouri in August 2022.  Since moving, all four Plaintiffs have suffered repeated representational injuries because they live and vote in a State that was robbed of a congressional seat and electoral vote due to the 2020 Census and 2021 Apportionment.  In this context, the Supreme Court has already held that individual "voters have standing to challenge" Census practices "because they are asserting a plain, direct and adequate interest in maintaining the effectiveness of their votes."  *U.S. House of Representatives*, 525 U.S. at 331–32 (cleaned up).  Also, the Supreme Court has already held that individual voters

can establish an "undoubtedly . . . 'traceable' connection between the use of sampling in the decennial census and [their State's] expected loss of a Representative." *Id.* The Individual Plaintiffs can also establish redressability because a judicial order requiring re-tabulation of the 2020 Census and 2021 Apportionment would ensure that Missouri receives the representation to which it is entitled in Congress and the Electoral College.

68.    In addition to redressing injuries caused by the 2020 Census and 2021 Apportionment, Plaintiffs have standing to prospectively challenge their impending future injuries in the 2030 Census and the 2031 Apportionment. The Census Bureau's website confirms that it will continue the Carter Administration Policy of including illegal aliens in the decennial Census and apportionment. For example, the Census Bureau's website currently states that "unauthorized migrants" and "temporary migrants (such as foreign students)" will be "counted" alongside legal immigrants who are permanent members of our society—including "naturalized U.S. Citizens" and "lawful permanent residents." U.S. Census Bureau, *Foreign-Born / About / Frequently Asked Questions* (accessed Jan. 27, 2026).[15] Later on the same webpage, the Bureau explicitly states that it "collects data from all foreign born who participate in its censuses and surveys, regardless of legal status. Thus, unauthorized migrants are implicitly included in the Census Bureau estimates of the total foreign-born population." *Id.*

69.    In another section of the Bureau's website about "Congressional Apportionment," the Bureau explicitly states that "unauthorized immigrants" are

---

[15] https://www.census.gov/topics/population/foreign-born/about/faq.html [https://perma.cc/TG5S-R3EK].

"included in the resident population counts" for apportionment because "all people (citizens and noncitizens) with a usual residence in the United States are included in the resident population for the census."  U.S. Census Bureau, *Congressional Apportionment / About / Frequently Asked Questions* (accessed Jan. 27, 2026).[16]

70.    The Census Bureau's current policy of including illegal aliens and temporary visitors in the 2030 Census and the 2031 Apportionment will again rob Missouri—and the Individual Plaintiffs—of representation in Congress and the Electoral College. Missouri's two retained experts agree that if only citizens and legal permanent residents are counted in 2030, Missouri will be entitled to nine congressional seats and eleven electoral votes.  *See* Doc. 1-1, Kincaid Rpt; Doc. 1-2, Trende Rpt.  But if the Carter Administration Policy remains in effect, Missouri will be entitled only to eight congressional seats and ten electoral votes.  Doc. 1-1, Kincaid Rpt; Doc. 1-2, Trende Rpt. This seat and electoral vote will instead be awarded to another State—like California— where at least 2.6 million illegal aliens currently reside.[17]

71.    Under the Carter Administration Policy, Missouri and other States will be collectively robbed of *eleven* congressional seats and electoral votes in 2030 and 2031. Doc. 1-1, Kincaid Rpt.  Comparatively, California will hold three additional seats and

---

[16] https://www.census.gov/topics/public-sector/congressional-apportionment/ about/faqs.html [https://perma.cc/KPK4-LK4W].

[17] Baker & Warren, *Estimates of the Unauthorized Immigrant Population Residing in the United States: January 2018–January 2022*, U.S. Dep't Homeland Security (April 2024), at 5, https://ohss.dhs.gov/sites/default/files/2024-06/2024_0418 _ohss_estimates-of-the-unauthorized-immigrant-population-residing-in-the-united-states-january-2018%25E2%2580%2593january-2022.pdf  [https://perma.cc/DT5V-N W3V].

electors, and States like Illinois, Massachusetts, and New York will each receive one additional congressional seat and elector. *Id.*

72.    The following graphic illustrates the expected 2031 Apportionment if the Carter Administration Policy persists, *see* Doc. 1-1, Kincaid Rpt. at 17:



73.    Next, the following graphic illustrates the adjustment to the 2031 Apportionment if—as the Constitution requires—only citizens and lawful permanent residents are counted, *see* Doc. 1-1, Kincaid Rpt. at 19:



74.    Importantly, the above graphic potentially understates the nationwide injury that the Carter Administration Policy will cause in 2030 and 2031.  That is because any projection based on publicly available data might fail to appreciate record-breaking illegal immigration during the latter years of the Biden Administration.  *Cf. Vasquez Perdomo*, 146 S. Ct. at 1 (Kavanaugh, J., concurring) (crediting federal government's claim that there are now "at least 15 million" illegal aliens in the United States with "[m]any millions illegally entered (or illegally overstayed) just in the last few years").

75.    This representational injury gives Missouri and the Individual Plaintiffs standing to prospectively challenge the Census Bureau's policy of including illegal aliens in the 2030 Census and 2031 Apportionment base.  As in prior cases, "it is certainly not necessary for [federal courts] to wait until the census has been conducted to consider the

issues presented here." *Dep't of Commerce v. U.S. House of Representatives*, 525 U.S. at 332. "There is undoubtedly a 'traceable' connection between" the inclusion of illegal aliens in the "decennial census" and Missouri's "expected loss of a Representative," and "there is a substantial likelihood that the requested relief—a permanent injunction against the proposed" inclusion of illegal aliens "in the census—will redress the alleged injury." *Id.*; *see also Alabama*, 396 F. Supp. 3d at 1050 ("[T]he Supreme Court has since clarified in no uncertain terms that states have standing to challenge census practices that cause them to lose a congressional seat, notwithstanding the statutory provisions that vest the President with the authority to issue the 'statement' that ultimately determines each state's congressional delegation." (citing *Utah*, 536 U.S. at 459–64)).

## III.    The Carter Administration Policy also skews intrastate redistricting within Missouri.

76.    Counting illegal aliens and temporary visa holders in the Census also creates serious problems for intrastate redistricting because it dilutes the votes of Missourians in state elections. Illegal aliens and temporary visa holders are disproportionately concentrated in metropolitan areas—such as Kansas City, St. Louis, and Springfield— and in counties such as Jasper County, where the meat-packing industry employs many illegal aliens. *See* Ramos et al., *4.1 million migrants: Where they're from, where they live in the U.S.*, The Washington Post (June 26, 2024) ["Ramos Study"].[18] The Carter Administration Policy dilutes the votes of Missourians who do not live in these locations.

---

[18] https://www.washingtonpost.com/immigration/interactive/2024/us-immigration-where-migrants-live/ [https://perma.cc/35AQ-BXJV].

77.    Like the United States Congress, the Missouri House of Representatives and the Missouri Senate have a fixed number of seats.  Article III, Section 3 of the Missouri Constitution provides that the "house of representatives shall consist of one hundred sixty-three members."  Mo. Const., art. III, § 3(a).  Likewise, Article III, Section 5 of the Missouri Constitution provides that the "senate shall consist of thirty-four members." *Id.*, art. III, § 5.    Thus, like federal congressional apportionment, statewide apportionment is a zero-sum game.

78.    The Missouri Constitution requires the use of federal decennial Census population numbers for Missouri's state legislative redistricting.  Specifically, Article III, Section 3 of the Missouri Constitution provides that after "each decennial census of the United States," a bipartisan commission must create a redistricting plan for the State House based on the results of the Census.  *Id.* § 3(c), (e)–(g).  Article III, Section 7 provides for the same procedure in the Senate.  *Id.* § 7(a), (c); *see also* Mo. Rev. Stat. § 1.100.1.  The State Constitution also requires that State House and Senate districts "shall be as nearly equal as practicable in population, and shall be drawn on the basis of one person, one vote."  *Id.* §§ 3(b)(1), 7(c); *see also Kirkpatrick v. Preisler*, 394 U.S. 526, 530–31 (1969) (holding that the U.S. Constitution also requires Missouri to "make a good-faith effort to achieve precise mathematical equality").

79.    However, the inclusion of illegal aliens and temporary visa holders in the Census hopelessly skews this project.  There are roughly 77,000 illegal aliens and 36,000

temporary visa holders in Missouri.[19]    And illegal aliens and visa holders are concentrated heavily in Kansas City, St. Louis, Springfield, and Jasper County.    *See* Ramos Study, *supra*.  This creates inherently unequal districts, where Missourians who live in districts with high concentrations of illegal aliens and temporary visa holders receive greater representation than Missourians who live in districts without those populations.

80.    All the Individual Plaintiffs live in state legislative districts where they are injured—and will continue to be injured—by the Carter Administration Policy because their votes are diluted vis-à-vis voters who live in counties and state legislative districts with larger populations of illegal aliens and temporary visa holders.

81.    To further understand this point, consider the Ramos Study, which analyzed "more than 4.1 million" immigration court records from between 2014 and 2024.  *See* Ramos Study, *supra*.  The researchers analyzed these records to gather data about where migrants with "immigration cases have settled" across the United States.  *Id.*  Jackson County, Missouri—where Kansas City is located—leads Missouri with 8,362 migrants with immigration cases who have settled in the County.  *Id.*  The City of St. Louis and St. Louis County weren't far behind with a combined 7,326 migrants with immigration

---

[19] *The Fiscal Burden of Illegal Immigration on United States Taxpayers*, Fed'n for Am. Immigr. Reform, at 40 (2023), https://www.fairus.org/sites/default/fil es/2023-03/Fiscal%20Burden%20of%20Illegal%20Immigration%20on%20American %20Taxpayers%202023%20WEB_0.pdf [https://perma.cc/4MV5-JMJT]; *Immigrants Make Missouri Stronger*, FWD.us (2023), at https://www.fwd.us/wp-content/uploads /2025/06/2025-Missouri-Fact-Sheet-.pdf#:~:text=Temporary%20Protected%20Status %20(TPS)%20holders%E2%80%94immigrants%20who%20cannot,contribute%20$26 0%20million%20to%20Missouri's%20economy%20annually [https://perma.cc/K9KM-SFKZ].

cases. *Id.* Jasper County, Missouri also contains 1,388 migrants with immigration cases notwithstanding the County's relatively small size. *Id.* Comparatively, about two-dozen Missouri counties do not have a single migrant with an immigration case residing within county borders. *Id.*

82. The Ramos Study illustrates how the Carter Administration Policy skews intrastate redistricting by mandating enumeration of illegal aliens and temporary visa holders. This causes representational injuries to each of the Individual Plaintiffs.

83. First, consider Plaintiff Andrea McCann, who resides in Franklin County, Missouri State House District 119, and Missouri State Senate District 26. *See* Doc. 1-4, McCann Decl. The Ramos Study found that "[l]ess than 100 migrants with immigration cases have settled" in Franklin County. Further, this number is likely lower in State House District 119, where McCann lives and where substantial portions of the district have no migrants with immigration cases. The following maps illustrate this point. For reference, the Ramos Study's finding is illustrated by the map on the left, with white indicating portions of Franklin County where no migrants "with immigration cases" reside. Missouri State House District 119, where McCann resides and votes, is shown in the map on the right. *See* Legislative District Maps: State House of Representatives, Mo. Sec'y of State, at https://www.sos.mo.gov/elections/maps [hereafter "State House Map"].



84.     Now, compare Franklin County and District 119—where McCann resides and votes—with Jasper County and State House District 163.  Jasper County contains 1,388 migrants with immigration cases total, and roughly 1,000 of those migrants live in State House District 163, *compare* Ramos Study (left), *with* State House Map (right):



85.     This disparity clearly dilutes McCann's vote relative to the vote of a Missourian who resides in State House District 163.  Again, intrastate apportionment is a zero-sum game.  There are only 163 house seats to apportion amongst Missouri's 6,154,913

residents (according the 2020 Census).  Mo. Const. art. III, § 3(a); *MISSOURI: 2020 Census*, U.S. Census Bureau (April 25, 2021).[20]   Also, all 163 districts must be apportioned in "a good-faith effort to achieve precise mathematical equality," which figures to only 37,760 people per State House District.  *See Kirkpatrick*, 394 U.S. at 530–31; Mo. Const. art. III, § 3(b).  Even if one generously assumes that 100 illegal aliens reside in District 119, *see* Ramos Study, the 1,000 migrants with immigration cases who live in District 163 alone disadvantages McCann by diluting her representation relative to voters who live in District 163.  This intrastate representational injury is sufficient to confer Article III standing on McCann.  *See U.S. House of Representatives*, 525 U.S. at 332–334 (Appellees had Article III standing because "[s]everal of the appellees reside in … counties" where it is "substantially likely" that they "will suffer vote dilution in state and local elections," and "several of the States in which these counties are located require use of federal decennial census population numbers for their state legislative redistricting. … [T]he appellees who live in the aforementioned counties have a strong claim that they will be injured by the [Census] Bureau's plan because their votes will be diluted vis-à-vis residents of counties with larger 'undercount' rates." (alteration original)).

86.   Next, consider the intrastate representational injury to Plaintiffs Phillip Fisher and Jessica Fisher.  The Fishers reside in Cass County, State House District 56, and State Senate District 31.  *See* Doc. 1-5, J. Fisher Decl.; Doc. 1-6, P. Fisher Decl.  The

---

[20] https://www.census.gov/library/stories/state-by-state/missouri.html [https://perma.cc/7VZJ-2N2C].

Ramos Study found that Cass County has a "173 migrants with immigration cases," which pales in comparison to nearby Jackson County—containing "8,362 migrants with immigration cases." For the same reasons explained above, *see supra* ¶¶ 76–85, this disadvantages the Fishers' votes in state elections relative to voters in Jackson County, where a higher concentration of illegal aliens live.[21]  Consider also the dilution of the Fishers' vote in State House District 56 vis-à-vis voters who live in State House District 163—where roughly 1,000 migrants with immigration cases reside. *Supra* ¶ 84. Even if one generously assumes that all 173 migrants in Cass County live District 56, *see* Ramos Study, the 1,000 migrants residing in District 163 unfairly advantage voters in District 163 relative to the Fishers. Because Missouri relies on census data to determine populations for intrastate apportionment, Mo. Const. §§ 3(c), (e)–(g), 7(a), (c); *see also* Mo. Rev. Stat. § 1.100.1, the Fishers' votes in Cass County are diluted relative to voters residing in districts with greater numbers of illegal aliens and temporary visa holders.

87.    Finally, consider the intrastate representational injury to Plaintiff David Mason. Mason resides in St. Louis County, State House District 110, and Missouri State Senate District 15. *See* Doc. 1-3, Mason Decl. The Ramos Study recorded 4,287

---

[21] To be sure, the 2020 Census found that Jackson County has 717,204 residents total while Cass County has 107,824 residents total—making Jackson County's pre-existing population 6.6 times larger than Cass County's population. *See MISSOURI: 2020 Census*, U.S. Census Bureau (April 25, 2021), https://www.census.gov/library/stories/state-by-state/missouri.html [https://perma.cc/7VZJ-2N2C]. However, the Ramos Study suggests that Jackson County has 48.3 times the number of "migrants with immigration cases" relative to Cass County. This suggests that the disparity the Ramos Study observed is partially due to a higher concentration of illegal aliens in Jackson County, not just an overall population disparity.

"migrants with immigration cases" that live in St. Louis County overall.  But Mason lives in a portion of the County where a lower concentration of such migrants live.  *See* Ramos et al.  For example, in State House District 110 specifically, there are fewer than a hundred migrants with active immigration cases.  *See id.*  Thus, as with the other Individual Plaintiffs, Mason's vote is diluted in state elections vis-à-vis voters who live in legislative districts with higher concentrations of illegal aliens and temporary visa holders.  *See supra* ¶¶ 76–85.

88.   These representational injuries are directly traceable to the Carter Administration Policy, which requires inclusion of illegal aliens and temporary visa holders in the census tabulation.  As to the 2020 Census, this ongoing injury is redressable by a judicial order requiring 2020 Census to be re-tabulated without inclusion of illegal aliens and temporary visa holders in the Census.  And as to the 2030 Census, Individual Plaintiffs' impending future injury will be prevented by an order prohibiting the Carter Administration Policy from persisting in the 2030 Census.  *See U.S. House of Representatives*, 525 U.S. at 332–34 ("Appellees have also established standing on the basis of the expected effects of the use of sampling in the 2000 census on intrastate redistricting. . . . [T]his expected intrastate vote dilution satisfies the injury-in-fact, causation, and redressibility requirements.").

89.   The Carter Administration Policy's effect on intrastate redistricting also supports the State of Missouri's Article III standing because it deprives Missouri of vital information that is necessary to comply with Missouri's constitutional obligations under the United States and Missouri Constitutions.  Again, the United States and Missouri

Constitutions both require Missouri to draw state legislative districts "on the basis of one person, one vote." Mo. Const. Art. III, §§ 3(b)(1), 7(c); *see also Kirkpatrick* 394 U.S. at 530–31. To be sure, this requires tabulation of all citizens and legally permanent residents (whether or not they can vote). But it does not include tabulation of illegal aliens and temporary visa holders—especially because the former "never" "enter[] the United States within the meaning of the law." *Kaplan*, 267 U.S. at 231; *Thuraissigiam*, 591 U.S. at 139.

90.    Even so, Missouri must rely on skewed census data when apportioning state legislative districts. *See* Mo. Const. Art. III, §§ 3, 7; *see also* Mo. Rev. Stat. § 1.100.1 ("The population of any political subdivision of the state for the purpose of representation . . . is determined on the basis of the last previous decennial census of the United States."). The Carter Administration Policy thus injures Missouri itself by degrading census data that Missouri relies on to fairly apportion state legislative districts. Indeed, it is impossible to comply with the "one person, one vote" rule, Mo. Const. Art. III, §§ 3(b)(1), 7(c); *Kirkpatrick*, 394 U.S. at 530–31, when Missouri must rely on census data altered by the inclusion of illegal aliens and temporary visa holders. This informational injury independently confers standing on Plaintiffs. *See Nat'l Urb. League v. Ross*, 508 F. Supp. 3d 663, 690 (N.D. Cal. 2020) (California counties who "rely on granular census data" had standing because "[t]he degradation of [census] data" is "an informational injury analogous to those that have supported Article III standing."); *Fed. Election Comm'n v. Akins*, 524 U.S. 11, 21 (1998) (collecting cases establishing that "deprivation of information" supports standing).

44

**IV.    The Carter Administration Policy also robs Missouri, its localities, its citizens, and its legal residents of federal funding and private funding that they would otherwise receive.**

91.    Counting illegal aliens in the Census has also deprived, and will continue to deprive, Missouri, its localities, its citizens, and its legal residents of federal funding to which they are entitled under federal law.  *See Dep't of Com. v. New York*, 588 U.S. at 759–60 ("The population count derived from the census is used not only to apportion representatives but also to allocate federal funds to the States . . ."); *Wisconsin v. City of New York*, 517 U.S. 1, 5–6 (1996) ("Today, census data also have important consequences not delineated in the Constitution: The Federal Government considers census data in dispensing funds through federal programs to the States . . .").

92.    Over 350 federal programs rely on the population figures collected in the decennial Census to allocate funds to state and local governments.  *See The Currency of Our Data: A Critical Input Into Federal Funding*, U.S. Census Bureau (2023).[22]  The Census Bureau estimates that "more than $2.8 trillion in federal funding was distributed in fiscal year 2021 to states, communities, tribal governments and other recipients using Census Bureau data in whole or in part."[23]

---

[22] https://www.census.gov/content/dam/Census/library/factsheets/2023/comm/factsheet-federal-funding.pdf [https://perma.cc/VAP6-89MU].

[23] U.S. Census Bureau, *Census Bureau Data Guide More Than $2.8 Trillion in Federal Funding in Fiscal Year 2021*, at 2 (June 14, 2023), https://www.census.gov/newsroom/press-releases/2023/decennial-census-federal-funds-distribution.html [https://perma.cc/3XFP-DF9Z]; *see also* Ceci Villa Ross, *Uses of Decennial Census Programs Data in Federal Funds Distribution: Fiscal Year 2021*, U.S. Census Bureau (June 2023), https://www2.census.gov/library/working-papers/2023/decennial/census-data-federal-funds-fy-2021.pdf [https://perma.cc/Z4QN-83ER].

93.     Including illegal aliens in the 2020 and 2030 Census enumerations has harmed—and will harm—Missouri, its localities, its citizens, and its legal permanent residents by depriving them of their fair share of federal funds.  For instance, the Missouri Department of Transportation ("MoDOT") "receives funding from federal programs that rely on census data—either in whole or in part—to apportion funding to MoDOT." Doc. 1-7, Hassinger Decl. ¶ 3.  As an example, consider the National Highway Traffic Safety Administration's (NHTSA) grants to promote State highway safety programs.  *See* 23 U.S.C. § 402; *see* Doc. 1-7, Hassinger Decl. ¶¶ 4–8.  Federal law requires each State to have "a highway safety program," and the federal government (through NHTSA) "appropriate[s]" funding to "the States to conduct the highway safety programs" required by federal law.  *See id.* § 402(a)(1), (c)(1)(A).  MoDOT uses this funding for multiple programs that prevent deaths and severe injuries on Missouri highways.  *See* Doc. 1-7, Hassinger Decl. ¶ 6.  That includes: "public awareness campaigns," "traffic enforcement activities," "driver's education programs," "child safety seats," and "emergency response equipment." *Id.*

94.     Federal apportionment of most of this highway safety funding is explicitly based on census data.  Section 402(c)(2)(B)(i) provides that "75 percent" of the funding "shall be apportioned to each State based on the ratio that, as determined by the most recent decennial census—(aa) the population of the State; bears to (bb) the total population of all States . . ." 23 U.S.C. § 402; *see* Doc. 1-7, Hassinger Decl. ¶ 5.  The Carter Administration Policy skews this formula by penalizing States (like Missouri) whose populations contain a lower percentage of illegal aliens and temporary visa

holders relative to the national average.  The Carter Administration Policy also rewards States (like California) whose populations contain a greater percentage of illegal aliens and temporary visa holders than the national average.

95.     On September 29, 2025, NHTSA announced its apportionment of the Section 402 Highway Safety Program funds for Fiscal Year 2026.  California was apportioned $37,088,840.83 (more than any other State) and Missouri was apportioned $8,255,089.12.[24]  But for the inclusion of illegal aliens in the census tabulation, Missouri would have received a greater share of the available highway safety funding while States with unlawfully inflated populations (like California) would have received a lesser share. *See* 23 U.S.C. § 402(c); *see* Doc. 1-7, Hassinger Decl. ¶¶ 7–8.  The Carter Administration Policy thus robs Missouri of "highway safety" funding that it would otherwise receive if the Census were lawfully tabulated.  *See id.* § 402(a), (c).

96.     Hundreds of other federal programs rely on census data to apportion funding amongst the States.  As just a few more examples, consider: **(1)** the "Charles Grassley Juvenile Justice and Delinquency Prevention Program," which allocates funds "annually among the States on the basis of *relative* population of people under 18 years of age, based on the most recent data available from the Bureau of the Census," 34 U.S.C. § 11132(a)(1) (emphasis added);  **(2)** the "Rural Development and Small Farm Research and Education" appropriations, which are "allocated to each State" largely based on the

---

[24] *NHTSA Approves More Than $800M for State to Make Roads Safer*, NHTSA (Sept. 29, 2025), at https://www.nhtsa.gov/press-releases/nhtsa-approves-more-than-800M-for-states#:~:text=The%20National%20Highway%20Traffic%20Safety%20Administration%20has,traffic%20safety%20grants%20for%20Fiscal%20Year%202026 [https://perma.cc/3YCU-3PBN].

47

"ratio" of "the rural population of the State bears to the total rural population of all the States, as determined by the last preceding decennial census current at that time," 7 U.S.C. § 2663(b)(4); and **(3)** the "Rural Transit Assistance Program," apportioned partly based on "the population of rural areas in that State and divided by the population of all rural areas in the United States, as shown by the most recent decennial census of population," 49 U.S.C. § 5311(c)(4)(B)(iii).  The examples could go on.  *See The Currency of Our Data: A Critical Input Into Federal Funding*, U.S. Census Bureau (2023) (over 350 federal programs rely on census data to apportion funding amongst states and localities).[25]

97.    Because the funds in these programs and other federally-funded programs are allocated based on data collected in the decennial Census, Missouri has lost—and will continue to lose—federal funding that Missouri is rightfully entitled to.  These funds are redistributed to States that have a higher percentage of illegal aliens as part of their census population.

98.    Missouri's percentage of illegal aliens relative to total population is far lower than the national average.  The Census Bureau recorded 6,154,913 people residing in Missouri as of the date of the 2020 Census.  *MISSOURI: 2020 Census*, U.S. Census Bureau (April 25, 2021).[26]  Simultaneously, about 77,000 illegal aliens live in Missouri,[27]

[25] https://www.census.gov/content/dam/Census/library/factsheets/2023/comm/ factsheet-federal-funding.pdf [https://perma.cc/VAP6-89MU].

[26] https://www.census.gov/library/stories/state-by-state/missouri.html [https://perma.cc/7VZJ-2N2C].

[27] *The Fiscal Burden of Illegal Immigration on United States Taxpayers*, Fed'n for Am. Immigr. Reform, at 44 (2023), https://www.fairus.org/sites/default/fil

which figures to just 1.25% of the population.  Comparatively, the federal government estimates that there were 10,500,000 illegal aliens in the United States in 2020,[28] making up 3.17% of the total population of 331,449,281 people across the fifty States.[29] In light of this disparity, the Census Bureau's unconstitutional decision to include illegal aliens in the census tabulation unfairly deprives Missouri of federal funds that it is rightfully entitled to.

99.    The Census Bureau's decision also unfairly benefits States like California, where illegal aliens are a far greater percentage of the population relative to the national average.  In California, for example, there were about 2,410,000 illegal aliens during the 2020 Census,[30] who made up 6.07% of California's population of 39,538,223 people. Thus, counting illegal aliens in the Census benefits States like California at Missouri's

---

es/2023-03/Fiscal%20Burden%20of%20Illegal%20Immigration%20on%20American %20Taxpayers%202023%20WEB_0.pdf [https://perma.cc/4MV5-JMJT].

[28] Baker & Warren, *Estimates of the Unauthorized Immigrant Population Residing in the United States: January 2018–January 2022*, U.S. Dep't Homeland Security (April 2024), at 5, https://ohss.dhs.gov/sites/default/files/2024-06/2024_0418 _ohss_estimates-of-the-unauthorized-immigrant-population-residing-in-the-united- states-january-2018%25E2%2580%2593january-2022.pdf [https://perma.cc/DT5V-N W3V].

[29] *First 2020 Census Data Release Shows U.S. Resident Population of 331,449,281*, U.S. Census Bureau (April 26, 2021), https://www.census.gov/library/ stories/2021/04/2020-census-data-release.html#:~:text=The%20population%20count s%20used%20for,West%20Virginia%20will%20lose%20seats [https://perma.cc/Z2VM -MWQF].

[30] Baker & Warren, *Estimates of the Unauthorized Immigrant Population Residing in the United States: January 2018–January 2022*, U.S. Dep't Homeland Security (April 2024), at 5, https://ohss.dhs.gov/sites/default/files/2024-06/2024_0418 _ohss_estimates-of-the-unauthorized-immigrant-population-residing-in-the-united- states-january-2018%25E2%2580%2593january-2022.pdf [https://perma.cc/DT5V-N W3V].

expense and results in Missouri receiving a proportionately smaller percentage of the federal funds disbursed by various federal programs. Those losses of funds harm Missouri, which must either meet these needs through state funding or allow resource needs to go unmet.

100. Such pocket-book injuries are textbook cognizable injuries for standing purposes. *TransUnion LLC v. Ramirez*, 594 U.S. 413, 425 (2021). These injuries were "caused" by the 2020 Census. *Id.* at 423. And those injuries can be "redressed" by a declaration that the 2020 Census was unlawfully conducted, as well as by an order to re-tabulate the census enumeration, using the best available methods to exclude illegal aliens and temporary visa holders. *Id.* That order would result in Missouri receiving federal funding that it is rightfully entitled to, and even one additional dollar in federal funding would satisfy the redressability requirement. *See Uzuegbunam v. Preczewski*, 592 U.S. 279, 291 (2021) ("True, a single dollar often cannot provide full redress, but the ability 'to effectuate a partial remedy' satisfies the redressability requirement." (quoting *Church of Scientology of Cal. v. United States*, 506 U.S. 9, 13 (1992))).

101. Additionally, this Court should declare that the Carter Administration Policy is unlawful as to the 2030 Census and issue corresponding injunctive and declaratory relief. Without a prospective remedy, Missouri will again suffer monetary injuries because of the tabulation of illegal aliens and temporary visa holders in the 2030 Census. As in 2020, illegal aliens will again make up a smaller percentage of Missouri's population in 2030 than the average percentage in other States. *Supra* ¶ 98; *cf. also* Doc. 1-1, Kincaid Rpt.

102.    An accurate Census is also necessary to allow public and private actors to identify and meet community and business needs.  For example, in the private sector, investors use census data to decide where to open businesses, and national chains use census data to make hiring plans.  *See* U.S. Census Bureau, *Can Census Bureau Data Drive Business Growth and Job Creation?* (Oct. 16, 2019).[31]

103.    Non-profit organizations use census data to decide where to provide critical aid such as health care and natural disaster relief.  *See* U.S. Census Bureau, *American Community Survey Resources for Nonprofits* (Feb. 14, 2025).[32]

104.    Including illegal aliens in the census enumeration has deprived historically-disadvantaged and low-income communities in Missouri of vital private resources by steering those resources to States with higher numbers of illegal aliens.

105.    Missouri will need to expend additional resources to compensate for the loss of vital aid from private actors to Missourians, and the needs of some Missourians will go unmet.

## V.    The Carter Administration Policy violates the Apportionment Clause's command that "[r]epresentatives shall be apportioned among the several States according to their respective numbers."

106.    The Carter Administration Policy violates the Fourteenth Amendment's command that "[r]epresentatives shall be apportioned among the several States according to their respective numbers, counting the whole number of persons in each

---

[31] https://www.census.gov/library/stories/2019/10/can-census-bureau-data-drive-business-growth-job-creation.html#:~:text=He%20had%20just%20paid%20off, Employment [https://perma.cc/VXP8-UN42].

[32] https://www.census.gov/programs-surveys/acs/information-for/nonprofits.html [https://perma.cc/YE9C-YWJ4].

State, excluding Indians not taxed." U.S. Const. amend. XIV, § 2. The phrase "whole number of persons in each State" requires an apportionment base consisting only of a State's *inhabitants*—meaning those who are lawfully domiciled with "allegiance or enduring tie" to the State where they are counted. *Franklin*, 505 U.S. at 804–05. That includes voting inhabitants, such as citizens, and non-voting inhabitants, such as children and legal permanent residents. But it does not include illegal aliens and temporary visa holders, such as foreigners here on student visas and work visas. Illegal aliens violate federal law by trespassing into the United States, so they cannot become domiciled in a State as one of its inhabitants. *See Castellon-Contreras v. I.N.S.*, 45 F.3d 149, 153 (7th Cir. 1995); *Lok v. INS*, 681 F.2d 107, 109 (2d Cir. 1982). And temporary visa holders are admitted to the United States only on a *temporary* basis, so they cannot become domiciled here. *See Elkins*, 435 U.S. at 665 (Student visas and work visas are examples where "Congress expressly conditioned admission . . . on an intent not to abandon a foreign residence or, by implication, on an intent not to seek domicile in the United States."); *Toll*, 458 U.S. at 14 n.20 ("Congress has precluded" certain aliens—including "foreign students" and "temporary workers"—from "establishing domicile in the United States."); *Carlson*, 249 F.3d at 880–81 (An alien whose "continued presence in this country would be illegal" "lacks the legal capacity to establish domicile in the United States."). Counting such foreigners in the decennial Census and apportionment violates Section 2 of the Fourteenth Amendment's command that "[r]epresentatives shall be apportioned among the several States according to their respective numbers."

**A. Only a State's inhabitants qualify as part of the "whole number of persons in each State" for purposes of the Apportionment Clause.**

107.    In 1868, Congress and the States ratified Section 2 of the Fourteenth Amendment to replace the Constitution's original Apportionment Clause in Article I, Section 2.  The original Apportionments Clause provided, "Representatives and direct Taxes shall be apportioned among the several States which may be included within this Union, according to their respective Numbers, which shall be determined by adding to the whole Number of free Persons, including those bound to Service for a Term of Years, and excluding Indians not taxed, three fifths of all other Persons."  U.S. Const. art. I, § 2.

108.    The second Apportionment Clause—contained in Section 2 of the Fourteenth Amendment—altered the original Clause's language about slaves counting only as three-fifths of a person for apportionment purposes.  However, the second Apportionment Clause otherwise retained identical language as the original Apportionments Clause. *Compare* U.S. Const. art. I, § 2, *with id.* amend. XIV, § 2.  Both Clauses explicitly require that "Representatives" "shall be apportioned among the several States" "according to their respective numbers," counting the "whole number" of "persons" in each State. *Compare* U.S. Const. art. I, § 2, *with id.* amend. XIV, § 2; *see Stokeling v. United States*, 586 U.S. 73, 80 (2019) ("[I]f a word is obviously transplanted from another legal source, whether the common law or other legislation, it brings the old soil with it." (quotation omitted)).

109.    At both the time of the founding and when the Fourteenth Amendment was ratified, the language of the Apportionment Clauses was widely understood to require an apportionment base comprised solely of the States' *inhabitants*—meaning those who

53

were legally domiciled in each State. *Franklin*, 505 U.S. at 804–05; *accord Wong Kim Ark*, 169 U.S. at 656 ("[C]ivil status is universally governed by the single principle of domicile."). The phrases "whole number of persons in each State" has never been understood to require literally every person in the State on census day to be included in the apportionment base. *See, e.g.*, Final 2020 Census Residence Criteria and Residence Situations, 83 Fed. Reg. at 5533 (excluding from the census tabulation "[c]itizens of foreign countries visiting the United States, such as on a vacation or a business trip"). The phrase was merely understood to be broad enough to capture voting and non-voting *inhabitants*—again, meaning those who are lawfully domiciled in the State.

110. If one accepts that premise—as the U.S. Supreme Court did in *Franklin*, 505 U.S. at 804–05—the consequences for the Census and apportionment are clear. At the time the Fourteenth Amendment was enacted, domicile had the same basic meaning as it does today. *See, e.g.*, *Wong Kim Ark*, 169 U.S. at 656–57 (discussing law of domicile from prior decades). A person cannot be domiciled in a State unless he has a lawful intent to permanently remain in that State. *See, e.g.*, *Castellon-Contreras*, 45 F.3d at 153 ("In order to have a 'lawful domicile,' then, an alien must have the ability, under the immigration laws, to form the intent to remain in the United States indefinitely. Thus, an alien who enters the country illegally cannot have a 'lawful' intent to remain here."); *Melian v. INS*, 987 F.2d 1521, 1524 (11th Cir. 1993) (holding that domicile "means at least the simultaneous existence of lawful physical presence in the United States and lawful intent to remain in the United States indefinitely"); *Lok v. INS*, 681 F.2d at 109

54

("Lok established lawful domicile only when his intent to remain was legal under the immigration laws.").

111.   Under longstanding principles of domicile, two groups of people cannot be counted as part of the Census or deemed part of the apportionment base.  First, temporary visa holders to the United States cannot be counted—as the Census Bureau at least partially acknowledges.  *See* Final 2020 Census Residence Criteria and Residence Situations, 83 Fed. Reg. at 5533 (excluding temporary visitors on vacation and business trips, but not temporary visitors on student visas and temporary work visas).  Second, illegal aliens cannot be counted because they do not have a *lawful* intent to permanently remain in the United States.

112.   Even if *Franklin* were not dispositive, founding-era history, text, and post-enactment history confirm that the original and second Apportionment Clauses both require tabulating only a State's *inhabitants—i.e.*, its domiciliaries—in the decennial Census and apportionment.

113.   ***Founding-era history:*** The framers of the original Apportionment Clause did not understand the Clause to refer literally to all persons who happened to be present in a State when the Census occurred.  Instead, they understood its reference to "persons" as synonymous with "inhabitants" or "domiciliaries."

114.   Indeed, drafts of the original Apportionment Clause—including the version initially approved by the Constitutional Convention—used the term "inhabitants" rather than "persons" or "residents."  2 M. Farrand, *Records of the Federal Convention of 1787*, at 571 (Farrand, ed., Yale University Press, 1911); *Franklin*, 505 U.S. at 804–05 & n.3.

Although the final version of the original Clause did not use the term "inhabitant," there was broad consensus that this was not a substantive change. *Franklin*, 505 U.S. at 804–05 & n.3.

115. For example, the Federalist Papers repeatedly state that the decennial Census and apportionment would tabulate the number of "inhabitants" in each State. *See The Federalist* Nos. 54, 56, 58 (Madison); *e.g.*, *id.* No. 58 (Madison) ("Within every successive term of ten years a census of *inhabitants* is to be repeated. The unequivocal objects of these regulations are, first, to readjust, from time to time, the apportionment of representatives to the number of *inhabitants* . . ." (emphasis added)). In fact, Federalist Papers 54, 56, and 58 use the term "inhabitant" eighteen times when discussing apportionment.

116. The First Congress understood the Apportionment Clause in precisely the same way. *See Franklin*, 505 U.S. at 803 ("[I]nterpretations of the Constitution by the First Congress are persuasive . . ."). The first Census statute—titled "An Act providing for the enumeration of the *Inhabitants* of the United States"—made clear that a person is "in" a State for Census and apportionment purposes only if he is a "usual resident" or "inhabitant" of the State. *An Act providing for the enumeration of the Inhabitants of the United States*, ch. 2, § 5, 1 Stat. 101, 103 (March 1, 1790) (emphasis added).

117. Additionally, every census statute preceding the Fourteenth Amendment's enactment provided for an enumeration of the "inhabitants" of the United States. *See An act providing for the second census or enumeration of the inhabitants of the United States*, 2 Stat. 11 (Feb. 28, 1800); *An act providing for the third Census or enumeration*

*of the Inhabitants of the United States*, 2 Stat. 564 (March 26, 1810); *An Act to provide for taking the fourth census, enumeration of the Inhabitants of the United States, and for other purposes*, 3 Stat. 548 (March 14, 1820); *An Act to provide for taking the fifth census or enumeration of the inhabitants of the United States*, 4 Stat. 383 (March 23, 1830); *An Act to provide for taking the sixth census or enumeration of the inhabitants of the United States*, 5 Stat. 331 (March 3, 1839); *An act providing for the taking of the seventh and subsequent Censuses of the United States*, § 1, 9 Stat. 428 (May 23, 1850) (providing for the 1850 and 1860 Censuses, and requiring "the marshals of the several districts of the United States" to "cause all the *inhabitants* to be enumerated" (emphasis added)).

118.    The consistent use of the word "inhabitant" is important because it would have been understood to reference and incorporate the concept of domicile.  Emmerich de Vattel, the leading eighteenth century treatise writer on international law, defined "inhabitants" as "foreigners" "who are permitted to settle and stay in the country."  1 Emmerich de Vattel, *The Law of Nations* § 213, at 101 (J. Chitty ed. 1844) (1758).  And in a 1784 letter, John Adams observed that "[b]oth Citizens and Inhabitants have a Right to Protection.  But every Stranger who has been in the United States, or who may be there at present is not an Inhabitant.  Different States have different Definitions of this Word.  The Domicile and the animus habitandi is necessary in all."  *See* Letter from John Adams to the President of Congress (Nov. 3, 1784).[33]  For the framers of the Constitution (and, later, the Fourteenth Amendment), the key to becoming an inhabitant was the

---

[33] https://masshist.org/publications/adams-papers/index.php/view/ADMS-06-16-02-0237 [https://perma.cc/UXN9-6HG5].

acquisition of domicile. *See id.* As Justice Bushrod Washington explained in 1818, a Spanish merchant who had lived in Pennsylvania for several months "was not an inhabitant of this country, as no person is an inhabitant of a place, but one who acquires a domicil there." *Bas v. Steele*, 2 F. Cas. 988, 993 (C.C.D. Pa. 1818) (Washington, Circuit Justice).

119.    At the time of the founding and the mid-nineteenth century, domicile had a well-established meaning. *See* Joseph Story, *Commentaries on the Conflict of Laws*, § 41 (1834). As is true today, one could only be domiciled in a place where he permanently intended to remain. *See, e.g.*, *id.* ("true, fixed, and permanent home"); *Wong Kim Ark*, 169 U.S. at 693–94. For example, in *Hardy v. De Leon*, the Texas Supreme Court held individuals involuntarily removed from Texas to Louisiana during the Mexican-American war remained domiciled in Texas, because those individuals had no intent to permanently remain in Louisiana. 5 Tex. 211, 236–37 (1849).

120.    But subjective intent to remain in a place is not good enough to establish domicile. As a matter of law, a person can establish domicile "only when his intent to remain was legal" under the laws. *Lok*, 681 F.2d at 109; *see Wong Kim Ark*, 169 U.S. at 694 (emphasizing that individuals could only establish domicile "so long as they are permitted by the United States to reside here."). Even Roman law provided that no one could establish "domicile" in a place "forbidden to him." 4 *The Digest of Justinian* 906a (Theodor Mommsen et al., eds. 1985) (Dig. 50.1.31). This understanding continued during the founding era. Emmerich de Vattel—"the founding era's foremost expert on

58

the law of nations"[34]—documented that domicile could only be established when a person was "*permitted* to settle and stay in the country."  1 Emmerich de Vattel, *The Law of Nations* § 213, at 101 (J. Chitty ed. 1844) (1758) (emphasis added).  Or, to use Story's language, a person cannot have a "fixed" and "permanent home" in a place where his presence is unlawful.  Joseph Story, *Commentaries on the Conflict of Laws*, § 41 (1834).

121.   ***Text:***  The Apportionment Clause's historical context helps demonstrate how its text would have been originally understood.

122.   Notably, the Clause's text uses possessory terms that make clear that States are entitled to apportionment credit only for "their" inhabitants—*i.e.*, those domiciled in the State.  Section 2 of the Fourteenth Amendment says, "Representatives shall be apportioned among the several States according to *their respective numbers*, counting the whole number of persons in each State, excluding Indians not taxed."  U.S. Const. amend. XIV, § 2.  The original Apportionments Clause used substantially similar language, "Representatives and direct Taxes shall be apportioned among the several States which may be included within this Union, according to *their respective Numbers* . . ."  U.S. Const. art. I, § 2.

123.   Both Apportionment Clauses explicitly require apportionment "according to" to the number of persons that States can claim as "their[s]"—meaning their citizens and legal permanent residents.  Like today, the term "their" was a possessory term at the time of the founding and the framing of the Fourteenth Amendment.  For example, Webster's 1828 Dictionary defines "their" as a term that "has the sense of a pronominal

---

[34] *Franchise Tax Bd. of California v. Hyatt*, 587 U.S. 230, 239 (2019).

adjective, denoting of them, or the possession of two or more; as *their* voices; *their* garments; *their* houses; *their* land; *their* country." *Their*, N. WEBSTER, AMERICAN DICTIONARY OF THE ENGLISH LANGUAGE (1828) (emphasis in original). In other words, to count as part of the population for apportionment purposes, one must be said to be part of the *State's* "respective numbers." U.S. Const. amend. XIV, § 2. The phrase "counting the whole number of persons" thus refers to the *subset* of all "persons" in a State who are *part* of the State—that is, those who already count as among a State's respective numbers.

124.    *Federalist* 54 bolsters this reading. *Federalist* 54 emphasized that the original Apportionment Clause would guard against States "exaggerating their inhabitants" because it established "a common measure for representation and taxation." This is significant for two reasons:  First, it shows that the founders contemplated States exaggerating their inhabitants, meaning that they believed States could find unlawful ways to include people in their apportionment base who were not actually inhabitants of the State.  Second, *Federalist* 54 emphasized the importance of tying representation *and taxation* together. *See id.*; U.S. Const. art. I, § 2 ("Representatives *and direct Taxes* shall be apportioned among the several States . . . according to their respective Numbers." (emphasis added)).  This is significant because taxation, like representation, is a hallmark of being part of the social contract.  Indeed, the United States was founded largely because the colonists were taxed like British subjects but were not afforded representation in Parliament.  The founders understood that citizens and legal residents

would be entitled to representation—and subject to "direct Taxes"—while temporary visa holders or members of an invading army would not be subject to either.[35]

125.   Moreover, the original Apportionment Clause's reference to the "whole Number of free Persons" was not introduced to expand the universe of persons captured by the Clause's main provision—representatives shall be apportioned according to the states' "respective Numbers"—but merely to distinguish between representation for free persons and for slaves.  *See* U.S. Const. art. I, § 2, CL. 3.  Without having to grapple with slavery, the original Apportionment Clause could have simply stated, "Representatives and direct Taxes shall be apportioned among the several States which may be included within this Union, according to their respective Numbers, excluding Indians not taxed." Yet to implement the Three-Fifths Compromise without mentioning slavery, the framers needed to provide for apportionment among the States "according to their respective Numbers, which shall be determined by adding to whole Number of free Persons, . . . and . . . three fifths of all other Persons." U.S. Const. art. I, § 2, CL. 3.  This

---

[35] Today's federal government taxes non-resident aliens on income related to their trade or business in the United States and on income derived from sources within the United States.  *See* 26 U.S.C. § 871.  This is constitutional because of the Sixteenth Amendment, which separated taxation of income from apportionment: "The Congress shall have power to lay and collect taxes on incomes, from whatever source derived, without apportionment among the several States, and without regard to any census or enumeration."  U.S. Const., amend. XVI.  That said, the Sixteenth Amendment was ratified in 1913, and has no influence on how the founders and framers of the Fourteenth Amendment would have understood the connection between direct taxation and apportionment.   Also, even after the Sixteenth Amendment, the federal government continues to treat citizens and resident aliens differently than non-resident aliens.  Citizens and resident aliens must pay taxes on their "worldwide income."  *Zhengnan Shi v. Comm'r*, 108 T.C.M. (CCH) 212, *5 (T.C. 2014).   "A nonresident alien individual, on the other hand, is usually subject to taxation only on U.S. source income."  *Id.*; *see* 26 U.S.C. § 871; 26 C.F.R. § 1.1-1.

phrasing was not intended to alter the very purpose of the Clause, which enacted a theory of republican representation rooted in the social contract, but rather to clarify how enslaved persons already part of the States' respective "numbers" would be counted. *See The Federalist* No. 54 (Madison) (attempting to justify the original Apportionments Clause, stating "Let the case of the slaves be considered, as it is in truth, a peculiar one. Let the compromising expedient of the Constitution be mutually adopted, *which regards them as inhabitants*, but as debased by servitude below the equal level of free inhabitants . . ." (emphasis added)). The phrase also clarified that other inhabitants like women and children were entitled to representation even if they could not vote—a point later made explicitly in connection with the phrase's inclusion in the Fourteenth Amendment. *See infra* ¶ 142.

126.    ***Post-enactment History:*** Since the ratification of the Constitution and the Fourteenth Amendment, there is evidence the first and second Apportionment Clauses were understood to incorporate a domicile standard to determine who is counted in the Census and weighed for congressional apportionments. Neither Congress nor the President has ever awarded representation based on the number of all persons physically present in the United States on census day.

127.    For example, temporary sojourners—people traveling in a State for business or vacation on census day—are not part of "the whole number of persons in each State" under the Fourteenth Amendment. *See* Final 2020 Census Residence Criteria and Residence Situations, 83 Fed. Reg. at 5533; *see also Klutznick*, 486 F. Supp. at 567 ("[S]ince the first census in 1790," the consistent "practice" is to exclude "foreign tourists"

62

from the census tabulation). That is why President George Washington was "counted as a resident of Virginia" in the 1790 Census even though he "spent 16 weeks traveling through the States, 15 weeks at the seat of Government, and only 10 weeks at his home in Mount Vernon" "during the 36-week enumeration period of the 1790 census." *Franklin*, 505 U.S. at 804. Although Washington spent most of his time away from Virginia, he remained domiciled in Virginia while traveling for official business.

128. As another example, non-admitted immigrants detained at ports of entry—like Ellis Island—were historically excluded from the decennial Census and apportionment. Between 1900 and 1920, during the years of peak operation for Ellis Island, a search of the census records yields no results for individuals residing or detained at Ellis Island.

129. As a final example, Congress and the executive branch have historically excluded foreign diplomatic personnel from the decennial Census and apportionment. *See, e.g.*, Presidential Memorandum, Excluding Illegal Aliens From the Apportionment Base Following the 2020 Census, 85 Fed. Reg. 44679 (July 21, 2020); 135 Cong. Rec. S22523 (Sept. 29, 1989) (Statement of Sen. Hatch);[36] Bureau of the Census, U.S. Dep't of Commerce, *Sixteenth Decennial Census of the United States, Instructions to Enumerators, Population and Agriculture* 20 (1940) ("Do not enumerate citizens of foreign countries employed in the diplomatic or consular service of their country.").[37]

---

[36] https://www.congress.gov/101/crecb/1989/09/29/GPO-CRECB-1989-pt16-3-1.pdf [https://perma.cc/9GM3-JMN3].

[37] https://www.archives.gov/files/research/census/1940/complete-instructions.pdf [https://perma.cc/GR7C-ZHX4].

130.    In surveying these and other historical examples, the bottom line is that the "whole number of persons in each State" refers to *inhabitants*—those domiciled in the States such that State can claim them as part of "their respective numbers."  U.S. Const. amend. XIV, § 2.

### B. Illegal aliens and temporary visa holders can never become domiciled in a State, so illegal aliens and temporary visa holders are not part of the population "in each State" under the Apportionment Clause.

131.    As discussed above, to be part of the "whole number of persons in each State" for Census and apportionment purposes, one must qualify as one of the State's *inhabitants—i.e.*, persons who are domiciled in the State.

132.    Under that standard, it becomes clear that illegal aliens and temporary visa holders cannot be counted.  Once again, an individual cannot be domiciled in a State unless he (1) intends to permanently remain there and (2) the law permits permanent residence.  *See, e.g.*, *Melian*, 987 F.2d at 1524 (holding that domicile "means at least the simultaneous existence of lawful physical presence in the United States and lawful intent to remain in the United States indefinitely"); *Lok*, 681 F.2d at 109 ("Lok established lawful domicile only when his intent to remain was legal under the immigration laws.").

133.    Temporary visa holders also do not establish domicile because they lack the subjective intent to permanently remain in a State.  *See, e.g.*, *Lynch v. Clarke*, 1 Sand Ch. 583 (N.Y. Ch. 1844) (person who moved from Ireland to United States and stayed for four years before going back was not domiciled at time he lived in United States).  Some federal laws even condition temporary admission on a foreigner *not* establishing domicile in a State.  In *Elkins v. Moreno*, for example, the Supreme Court highlighted student

64

visas and work visas as examples where "Congress expressly conditioned admission . . . on an intent not to abandon a foreign residence or, by implication, on an intent not to seek domicile in the United States." 435 U.S. at 665. *Toll v. Moreno* likewise noted that "Congress has precluded" certain aliens—including "foreign students" and "temporary workers"—from "establishing domicile in the United States." 458 U.S. at 14 n.20.

134.   Illegal aliens and temporary visa holders are also not inhabitants for purposes of the Census and Apportionments Clauses because federal law prohibits them from permanently residing in the United States.   No one—illegal aliens and temporary visa holders included—can establish domicile and secure the rights of inhabitants by entering or remaining in violation of federal law. *Castellon-Contreras*, 45 F.3d at 153 ("In order to have a 'lawful domicile,' then, an alien must have the ability, under the immigration laws, to form the intent to remain in the United States indefinitely.   Thus, an alien who enters the country illegally cannot have a 'lawful' intent to remain here."); *Carlson*, 249 F.3d at 880–81 (An alien whose "continued presence in this country would be illegal" "lacks the legal capacity to establish domicile in the United States."); *Melian*, 987 F.2d at 1524; *Lok*, 681 F.2d at 109; *cf. U.S. ex rel. Turner v. Williams*, 194 U.S. 279, 292 (1904) (The illegal alien "does not become one of the people to whom these things are secured by our Constitution by an attempt to enter, forbidden by law.   To appeal to the Constitution is to concede that this is a land governed by that supreme law, and as under it the power to exclude has been determined to exist, those who are excluded cannot

assert the rights in general obtaining in a land to which they do not belong as citizens or otherwise.").

135.   That is so because illegal aliens cannot satisfy the objective prong of domicile. Even if they *subjectively* intend to permanently remain in State, the law does not permit them to do so. *See Kaplan*, 267 U.S. at 231 (holding that an illegal alien living with her father in New York "never has entered the United States within the meaning of the law"); *Leng May Ma*, 357 U.S. at 188 ("For over a half century this Court has held that the detention of an alien in custody pending determination of his admissibility does not legally constitute an entry though the alien is physically within the United States."); *Thuraissigiam*, 591 U.S. at 139 ("[T]he alien is on U.S. soil, but the alien is not considered to have entered the country . . ."). "Thus, an alien who enters the country illegally cannot have a 'lawful' intent to remain here." *Castellon-Contreras*, 45 F.3d at 153.

### C. Reading Section 2 of the Fourteenth Amendment to require inclusion of illegal aliens and temporary visa holders in the decennial Census and apportionment disregards the text and history of the Amendment.

136.   Until the 1980 Census, no branch of the federal government seriously considered whether illegal aliens should be included in the decennial Census and apportionment. The executive is the only branch to have ever taken a position on this issue, and it first considered this question during the Carter Administration leading up to the 1980 Census. *See supra* ¶¶ 47–56. The Carter Administration wrongly claimed that the Fourteenth Amendment requires inclusion of illegal aliens in the Census, and it grossly misinterpreted constitutional text and history to get there.

137.   Most recently, the Biden Administration defended the longstanding Carter Administration Policy, *see* 86 Fed. Reg. 7015, and again, the executive branch grossly

misstated text and history.  As to text, the Biden Administration claimed that "whole number of persons in each State" is broad enough to encompass illegal aliens, 86 Fed. Reg. at 7015–16—an argument which proves too much and conflicts with the 2020 Census itself, which did not count temporary sojourners, *see* 83 Fed. Reg. at 5533.  As to history, the Biden Administration wrongly claimed that there was a long, unbroken tradition of including illegal aliens in the Census and apportionment base.  *See* 86 Fed. Reg. at 7015–16.  This is flatly inaccurate.  Rather, the modern conception of illegal aliens was completely unknown until the twentieth century.  And illegal aliens were not numerous enough to meaningfully affect census results—and give States standing to sue—until the last few decades.

138.   To see the gross error in the Carter Administration Policy, start with the text of the Fourteenth Amendment.  The first sentence in Section 2 contains two clauses: (1) the operative clause—"Representatives shall be apportioned among the several States *according to their respective numbers*"; and (2) a clarifying clause—"counting the whole number of persons in each State, excluding Indians not taxed."  U.S. Const. amend. XIV, § 2 (emphasis added).  The executive branch, focusing only on the clarifying clause, literally reads "the whole number of persons in each State" to constitutionally require the Department of Commerce to count every single human in each State on census day— whether or not federal law allows them to live in the United States permanently.  The executive's reading suffers from several defects that are apparent from the text.

139.   First, the executive has adopted a literal reading that swallows the operative clause of Section 2.  The Biden Executive Order, for example, focuses on the literal

definition of "person," wrongly concluding that because illegal aliens are "persons," they must be included in the apportionment. But that reading completely ignores the operative clause, which requires apportionment assignments to States "according to *their* respective numbers." U.S. Const. amend. XIV, § 2 (emphasis added). A literal reading of "person" therefore forsakes the command of the operative clause by including even non-inhabitants—who are not part of the State's respective numbers—in the decennial apportionment. Indeed, the executive branch's argument would provide representation even to Nazi spies who invaded Florida during World War II. *See Ex parte Quirin*, 317 U.S. 1 (1942). Although the spies were foreign enemies, the Biden Administration's literal interpretation of "persons in each State" would require including the Nazi spies in the apportionment base. *See* 135 Cong. Rec. S22523 (Sept. 29, 1989) (Statement of Sen. Hatch) (noting that, under the Carter Administration Policy, "an occupying army would qualify" as part of a State's numbers for apportionment purposes).[38]

140. Second, the executive's literal reading displays historical illiteracy about the background that led Congress to insert the "whole number of persons" language in 1868. *See* U.S. Const. amend. XIV, § 2. Properly done, originalism is not an exercise in literalism shorn from historical context. *See* Hon. Amy Coney Barrett, *Assorted Canards of Contemporary Legal Analysis: Redux*, 70 Case W. Res. L. Rev. 855, 857 (2020) ("Language . . . cannot be understood out of context, and literalism strips language of its

---

[38] https://www.congress.gov/101/crecb/1989/09/29/GPO-CRECB-1989-pt16-3-1.pdf [https://perma.cc/9GM3-JMN3].

context."); Caleb Nelson, *What Is Textualism?*, 91 Va. L. Rev. 347, 376 (2005) (No "mainstream judge is interested solely in the literal definitions of a statute's words."). To understand original meaning, courts must look to historical context to understand the reach—and limits—of broad constitutional language.  *See, e.g.*, *United States v. Rahimi*, 602 U.S. 680, 717 (2024) (Kavanaugh, J., concurring); *id.* at 709 (Gorsuch, J., concurring); *id.* at 737 (Barrett, J., concurring).

141.    As an initial matter, the framers of the Fourteenth Amendment almost certainly used the phrase "whole number of persons" because that was the language of the original Apportionment Clause.  *See, e.g.*, CONG. GLOBE, 39th Cong., 1st Sess. 3027 (1866) (statement of Sen. Johnson) (stating that those in favor of "the whole number of persons" language "stand upon the ground on which our fathers stood when they adopted a rule of the same description in the Constitution").  Section 2 of the Amendment was intended to update the original Clause by eliminating the three-fifths component that had become obsolete after adoption of the Thirteenth Amendment.  Section 2 was also designed to guard the voting rights of newly freed people by penalizing States if they denied them the right to vote.

142.    Additionally, the "whole number of persons" language helped to clarify that women and children, although they could not vote, should be included in the apportionment base because, as citizens of the United States, women and children warranted representation in Congress.  *See, e.g.*, CONG. GLOBE, 39th Cong., 1st Sess. 3035 (1866) (statement of Sen. Henderson); *id.* at 2962 (statement of Sen. Poland).

143. For a different reason, the framers of the Fourteenth Amendment also decided to include foreigners with a legal permanent residence in the apportionment base:  Doing so would more accurately capture representation of the voting population before the next decennial Census.  *See id.* at 354 (statement of Rep. Kelley); *see also id.* at 356 (statement of Rep. Conkling).  In 1868, States allowed nearly all legal immigrants to vote within five years of settling in the United States.  *See id.* at 2987 ("Nearly all the men who come to this country are naturalized in five years.") (statement of Sen. Sherman); *id.* at 2535 (statement of Rep. Eckley).  So it made sense to include legal immigrants in the decennial Census and apportionment, which occurred once every ten years.  *Id.* at 354 (statement of Rep. Kelley).  Additionally, the Fourteenth Amendment's framers feared that States would unwisely enfranchise aliens too quickly if the apportionment depended only on the number of voters in each State's apportionment base.  *Id.* at 141 (statement of Rep. Blaine); *id.* at 357 (statement of Rep. Conkling).

144. The "whole number of persons" language settled the framer's debate about whether just voters—or all voting and non-voting inhabitants—should be included in the decennial apportionment base.  The framers did not understand the phrase "whole number of persons" to require including illegal aliens, foreign ambassadors, transient visitors, and foreign invaders in the decennial Census and apportionment.  The framers would be flabbergasted if they learned of the executive branch's modern reading.  Indeed, given longstanding American ideas about the social contract and how representation works in a republic, it borders on the absurd to attribute the Carter Administration's understanding of the Fourteenth Amendment to the framers.  *See Calder v. Bull*, 3 U.S.

386, 388 (1798) ("The people of the United States erected their Constitutions . . . The purposes for which men enter into society will determine the nature and terms of the social compact . . ."); DECLARATION OF INDEPENDENCE (July 4, 1776) ("[T]o secure [unalienable] rights, Governments are instituted among Men, deriving their just powers *from the consent of the governed.*" (emphasis added)); 10 Op. Att'y. Gen. 382, 388 (1862) (Bates) (discussing "reciprocal obligation of allegiance on the one side and protection on the other").

145.   That is why—for over a hundred years after the Fourteenth Amendment's ratification—no branch of the federal government understood the Fourteenth Amendment to require inclusion of illegal aliens in the decennial Census.  And even after the Carter Administration Policy emerged during the 1980 Census, the Policy has remained the subject of ongoing controversy for forty-five years—with Congress and the Judiciary having yet to take a position on this issue.  The executive branch has therefore erred in appealing to text and tradition in attempting to justify its reading of the Fourteenth Amendment.

## VI.   No federal law contradicts the Fourteenth Amendment's command by requiring the Department of Commerce and the Census Bureau to include illegal aliens and temporary visa holders in the apportionment base.

146.   Searching for a justification for the Carter Administration Policy, the Biden Administration also appealed to federal statutory law, claiming that 2 U.S.C. § 2a and 13 U.S.C. § 141 require inclusion of illegal aliens in the decennial Census and apportionment.  86 Fed. Reg. at 7016.

147.   Section 2a(a) requires the apportionment base to include "*the whole number of persons in each State*, excluding Indians not taxed." 2 U.S.C. § 2a(a) (emphasis added). However, this language obviously comes from the Fourteenth Amendment itself, so it cannot be read to require the apportionment base to include illegal aliens and temporary visa holders—which the Fourteenth Amendment prohibits. *See* U.S. Const. amend. XIV, § 2 ("Representatives shall be apportioned among the several States according to their respective numbers, counting the whole number of persons in each State, excluding Indians not taxed."); *Stokeling*, 586 U.S. at 80 ("[I]f a word is obviously transplanted from another legal source, whether the common law or other legislation, it brings the old soil with it." (quotation omitted)).

148.   To be sure, when the 71st Congress enacted § 2a(a) in 1929, it inserted the phrase "whole number of persons" to require the President to include citizens and legal permanent residents in the decennial apportionment base.   However, as the Congressional Research Service has emphasized, the 71st Congress—and other Congresses before it—did "not" consider "*unauthorized aliens*, but rather consider the constitutionality and/or policy of excluding *lawful aliens*."   *See* Cong. Rsch. Serv., *Constitutionality of Excluding Aliens from the Census for Apportionment and Redistricting Purposes*, at 13 (April 2012) (emphasis added).[39]   Therefore, like Section 2 of the Fourteenth Amendment, the phrase "whole number of persons" in § 2a(a) was not

---

[39] https://www.everycrsreport.com/files/20120413_R41048_e4eb1c369b633cea 52b254c5a305e6111eb5d795.pdf

understood to require inclusion of illegal aliens in the decennial Census and apportionment base.

149.   In any event, even if § 2a could be read to support the Carter Administration Policy (it cannot), the Fourteenth Amendment takes precedence over § 2a.   Under the canon of constitutional avoidance, this Court must read § 2a(a) to avoid a conflict with the Fourteenth Amendment, which prohibits including illegal aliens and temporary visa holders in the apportionment base.   *See Jennings v. Rodriguez*, 583 U.S. 281, 286 (2018) (constitutional avoidance canon).   Thus, § 2a should be interpreted to use the phrase "whole number of persons" to refer only to a State's citizens and legal permanent residents.

150.   For the same reason, the Court should reject the Biden Administration's reading of 13 U.S.C. § 141.   The Biden Administration focused on subsection (b), which provides that "[t]he tabulation of *total population* by States under subsection (a) of this section as required for the apportionment of Representatives in Congress among the several States shall be completed within 9 months after the census date and reported by the Secretary to the President of the United States."   13 U.S.C. § 141(b) (emphasis added); 86 Fed. Reg. at 7016.   But the phrase "tabulation of total population by States under subsection (a)" just refers to the census tabulation, *see id.* § 141(a), and the central directive of § 141(b) is that the Secretary of Commerce must complete and transmit the total tabulation within 9 months after the census date so that it can be used for apportionment purposes.   Section 141(b) says nothing about whether illegal aliens and

temporary visa holders should be included in the decennial Census and apportionment by using the term "total population."

151.    In any event, in light of the canon of constitutional avoidance, this Court may not read § 141(b) to require inclusion of illegal aliens and temporary visa holders in the decennial Census and apportionment.  *See Jennings*, 583 U.S. at 286.  That reading would conflict with Section 2 of the Fourteenth Amendment.

**VII.    The Carter Administration Policy fundamentally undermines the basic principles of representation essential to the legitimacy of the federal government.**

152.    The Carter Administration Policy rests on a legal premise which, if examined more closely, borders on the absurd: the notion that the framers of the Apportionment Clauses intended to give those unlawfully present in the United States *representation* in the government.  This idea makes no sense.  Legal and political thinkers at the time of the founding and the 1860s understood the United States to be a social contract—one in which citizens and inhabitants received benefits from the government, including representation, in exchange for obligations like taxes and military service.  Declaration of Independence (July 4, 1776) ("[T]o secure [unalienable] rights, Governments are instituted among Men, deriving their just powers *from the consent of the governed*." (emphasis added)); 10 Op. Atty. Gen. 382, 388 (1862) (Bates) (discussing "reciprocal obligation of allegiance on the one side and protection on the other"); John Locke, *Second Treatise of Government* § 89 (Negri & Crawford eds., Dover 2002) (1689) ("[M]en . . . enter into society to make one people, one body politic, under one supreme government . . ."); *United States v. Escobar-Temal*, 161 F.4th 969, 985–86 (6th Cir. 2025) (Thapar, J., dissenting in part and concurring in the judgment) (The Constitution itself

74

"starts with 'We, the People.' . . . The founding generation understood that legitimate government derives its authority from the consent of the governed. The opening words of the Constitution ensure no one can ignore that revolutionary proposition." (quoting U.S. Const. Preamble)).

153.    In considering who should be represented in the federal government other than citizens, the Court should keep social-contract theory in mind—just as the framers of the Census and Apportionment Clauses would have. *See, e.g.*, *Calder*, 3 U.S. at 388 ("The people of the United States erected their Constitutions . . . The purposes for which men enter into society will determine the nature and terms of the social compact . . ."). For non-citizens who follow the immigration laws and are granted the right to permanently settle in the United States, it makes perfect sense to grant them representation because the people—through their elected representatives, have *consented* to admitting those individuals to the American social compact. *See, e.g.*, *Thuraissigiam*, 591 U.S. at 139 ("The power to admit or exclude aliens is a sovereign prerogative.").

154.    Additionally, legal permanent residents bear the continuing obligations of the social compact. For example, legal permanent residents are taxed just like citizens, while nonresident aliens are taxed only on U.S. source income. *See Zhengnan Shi v. Comm'r*, 108 T.C.M. (CCH) 212, *5 (T.C. 2014); 26 C.F.R. § 1.1-1. And like citizens, legal permanent residents must register for military selective service. 50 U.S.C. § 3802. But nonresident aliens—such as foreign diplomats, temporary sojourners, student-visa holders, and others—are expressly excluded from the selective-service requirement. *Id.* (exempting aliens admitted under 8 U.S.C. § 1101(a)(15)).

155.    By contrast, social contract theory does *not* support giving representation to illegal aliens and temporary visa holders, who are simply not part of the American social compact.    Illegal aliens, by definition, *undermine* the rules set by the people's elected representatives for joining the American social compact.    They are mere trespassers attempting to force entry into that compact—without the consent of the compact's current parties.    Requiring the American people to give representation to such trespassers is akin to requiring a homeowner, before he can renovate his home, to obtain the approval of any person trespassing on his property and setting up camp in the backyard.    Such a policy also violates the ancient legal maxim that one should not profit by his own wrongdoing.    *Oakey v. Bennett*, 52 U.S. 33, 39 (1850) ("Nullus commodum capere potest de injuriâ suâ propriâ."); *Reynolds v. United States*, 98 U.S. 145, 159 (1878) (invoking "the maxim that no one shall be permitted to take advantage of his own wrong").

156.    The Carter Administration Policy takes the same absurd course.    There is no possible way to include illegal aliens and temporary visa holders in the apportionment base consistent with the "constitutional goal of equal representation" for the People of the United States.    *Franklin*, 505 U.S. at 804, 806.    The founders themselves "sharply distinguished between American citizens and 'aliens,' who were subjects of foreign sovereigns." *Escobar-Temal*, 161 F.4th at 989 (Thapar, J., dissenting).    As Judge Thapar explained:

> The clearest articulation of this view appeared in George Washington's Farewell Address, jointly authored by Washington, James Madison, and Alexander Hamilton.    The Address started from the premise that "[t]he basis of our political systems is the right of the people to make and to alter their

> constitutions of government." . . . The "great rule of conduct" for the young republic was "hav[ing] with [foreign nations] as little political connection as possible," precisely because their "influence [wa]s one of the most baneful foes of republican government." Only "[i]f we remain one people" could we hope to "defy material injury from external [i.e., foreign] annoyance." As the Address underscored, the founders believed democratic governance necessitated a strict division between citizens and aliens.

*Id*. at 989–90 (alteration in original) (quoting George Washington, Farewell Address (U.S. Senate Hist. Off. 2017) (1796)). The Carter Administration Policy thus makes no sense of the Constitution, and indeed, of the very premise of American government.

157. But the damage is worse than that. The Carter Administration Policy also incentivizes States with higher populations of illegal aliens to encourage more illegal immigration in violation of federal law. It should thus be unsurprising that States like California, Illinois, and New York have continuously undermined federal immigration law. They have enacted laws "with the express goal 'of protecting immigrants from an expected increase in federal immigration enforcement actions.'" *E.g.*, *United States v. California*, 921 F.3d 865, 875 (9th Cir. 2019) (quoting Hearing on AB 450 Before the Assemb. Comm. on Judiciary, 2017–18 Sess. 1 (Cal. 2017) (synopsis)). They have refused to cooperate with federal immigration enforcement efforts. *E.g.*, *McHenry Cnty. v. Kwame Raoul*, 44 F.4th 581, 585 (7th Cir. 2022) (reviewing Illinois law prohibiting "State agencies and political subdivisions from contracting with the federal government to house immigration detainees"). And they have filed lawsuit after lawsuit to ensure that illegal aliens are included in the decennial Census and apportionment. *E.g.*, *Trump v. New York*, 592 U.S. 125 (2020).

158.   All of these actions were taken at the expense of States who honor federal immigration law—like Missouri—and have been deprived of representation in Congress and the Electoral College.

159.   The framers of the Census and Apportionment Clauses never intended an absurd regime where trespassers are entitled to representation in the federal government.  This regime is merely the modern invention of the executive branch.

## VIII.   The Residence Criteria for the 2020 and 2030 Censuses violate the Administrative Procedure Act by being contrary to law and the Constitution.

160.   The Administrative Procedure Act ("APA") requires this Court to hold unlawful and set aside any agency action that is "contrary to constitutional right, power, privilege, or immunity" or is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right."  5 U. S. C. § 706(2)(B), (C).  The APA also requires this Court to "compel agency action unlawfully withheld."  *Id.* § 706(1).

161.   This Court must set aside the Department of Commerce's Residence Criteria for the 2020 and 2030 Census because both sets of Criteria are contrary to law and the Constitution to the extent that they require tabulation of illegal aliens in the decennial Census.  Additionally, to redress Missouri's ongoing injury, the Court must "compel" the Department of Commerce to re-conduct the 2020 Census while excluding illegal aliens from the tabulation.

162.   As to the 2020 Census, the Department of Commerce promulgated and implemented the Final 2020 Census Residence Criteria and Residence Situations, 83 Fed. Reg. 5525 (Feb. 8, 2018).  The Residence Criteria for the 2020 Census established that all "[c]itizens of foreign countries living in the United States" would be "[c]ounted

at the U.S. residence where they live and sleep most of the time," regardless of whether they immigrated to the United States legally. *Id.* at 5533. The first Trump Administration attempted to mitigate the unconstitutional effects of the Census Bureau's criteria by including a citizenship question on the 2020 Census questionnaire and by attempting to exclude illegal aliens from the 2021 Apportionment. But litigation hampered the Trump Administration's efforts, and the Biden Administration suddenly reversed course in 2021—explicitly requiring inclusion of illegal aliens and temporary visa holders in the apportionment base. *See supra* ¶¶ 57–64. These agency and executive branch actions were contrary to law and the Constitution because, as alleged above, Section 2 of the Fourteenth Amendment, the Census Clause of Article I, Section 2, the Electoral Apportionment Clause of Article II, Section I, 2 U.S.C. § 2a, and 13 U.S.C. § 141 prohibit including illegal aliens and temporary visa holders in the decennial Census and apportionment. *See supra* ¶¶ 106–159.

163.   Next, as to the 2030 Census, the Census Bureau's website confirms that the Census tabulation will include illegal aliens and temporary visa holders who reside in the United States. The Census Bureau confirms that "unauthorized migrants" and "temporary migrants (such as foreign students)" will be "counted" alongside people who immigrated legally—including "naturalized U.S. Citizens" and "lawful permanent residents." U.S. Census Bureau, *Foreign-Born / About / Frequently Asked Questions* (accessed Jan. 27, 2026).[40] Later on the same webpage, the Bureau explicitly states that

---

[40] https://www.census.gov/topics/population/foreign-born/about/faq.html [https://perma.cc/TG5S-R3EK].

79

it "collects data from all foreign born who participate in its censuses and surveys, regardless of legal status.  Thus, unauthorized migrants are implicitly included . . ." *Id.*

164.   In another section of the Bureau's website about "Congressional Apportionment," the Bureau explicitly states that "unauthorized immigrants" are "included in the resident population counts" for apportionment because "all people (citizens and noncitizens) with a usual residence in the United States are included in the resident population for the census."  U.S. Census Bureau, *Congressional Apportionment / About / Frequently Asked Questions* (accessed Jan. 27, 2026).[41]  This is contrary to federal law and the U.S. Constitution.  As explained above, Section 2 of the Fourteenth Amendment, the Census Clause of Article I, § 2, the Electoral Apportionment Clause of Article II, § 1, 2 U.S.C. § 2a, and 13 U.S.C. § 141 all prohibit including illegal aliens and temporary visa holders in the decennial Census and apportionment.  *See supra* ¶¶ 106–159.

165.   The APA therefore requires this Court to hold unlawful and set aside the 2020 and 2030 Residence Criteria for the Census and any associated agency action implementing these standards as to the decennial Census and apportionment. The APA also requires this Court to "compel" any associated agency action that has been "unlawfully withheld."  5 U.S.C. § 706.

---

[41] https://www.census.gov/topics/public-sector/congressional-apportionment/about/faqs.html [https://perma.cc/KPK4-LK4W].

IX.    **In the alternative, the Residence Criteria for the 2020 and 2030 Censuses are "arbitrary," "capricious," and "an abuse of discretion" in violation of the Administrative Procedure Act.**

166.    In the alternative, even if this Court determines that neither the Constitution nor federal law *require* Defendants to exclude illegal aliens from the decennial Census and apportionment, Defendants at least hold *discretion* to exclude illegal aliens from the census tabulation and apportionment base.    The Supreme Court has repeatedly emphasized that the Secretary has substantial discretion in the administration of the Census and in the calculation of apportionment.  *Franklin*, 505 U.S. at 806.

167.    However, in this event, the Residence Criteria for the 2020 and 2030 Censuses would still be substantively invalid because they are "arbitrary," "capricious," and "an abuse of discretion" in violation of 5 U.S.C. § 706.

168.    In reaching the decision to include illegal aliens in the 2020 and 2030 census tabulations, Defendants had an obligation to "examine the relevant data and articulate a satisfactory explanation for [the] action including a 'rational connection between the facts found and the choice made.'"  *Motor Vehicle Mfrs. Assn. of United States, Inc. v. State Farm Mut. Automobile Ins. Co.*, 463 U.S. 29, 43 (1983) (quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962)).  The executive branch has never— including in the Biden Executive Order—explained how it could be rational to give representation in the government to individuals who are unlawfully present and have no right to remain in the United States.  This is a clear-cut situation where the executive "entirely failed to consider an important aspect of the problem" at hand.  *Id.*; *see Int'l Union, United Mine Workers of Am. v. Mine Safety & Health Admin.*, 626 F.3d 84, 94 (D.C. Cir. 2010).

169.   When finalizing the rules for the 2020 Census, a commenter "expressed concern about the impact of including undocumented people in the population counts for redistricting." 83 Fed. Reg. at 5530.  The Census Bureau's only response to this comment was to assert that this comment was "considered out of scope for this document" by the Census Bureau.  *Id.*  The Bureau did not give any substantive response to the comment or even attempt to justify its decision to include illegal aliens within the census tally used for apportionment.   Nor did the Census Bureau offer any justification for its conclusory assertion that this comment was beyond the scope of the Residence Criteria for the 2020 Census.   This failure renders the Residence Criteria arbitrary and capricious.  *See Sierra Club v. EPA*, 863 F.3d 834, 838–39 (D.C. Cir. 2017) (remanding to agency for further explanation because it "failed to respond adequately to comments" that agency argued were outside the scope of its determination).

170.   As for the 2030 Census, the federal executive branch has not yet made any attempt to justify the Carter Administration Policy—even though the Census Bureau's website repeatedly says that illegal aliens will be counted in future Censuses.  Although Defendants could theoretically offer such a justification in the future, this Court cannot assume they will do so.  *Alaska v. U.S. Dep't of Agric.*, 17 F.4th 1224, 1229 (D.C. Cir. 2021).

171.   For at least these reasons, the Residence Criteria for the 2020 and 2030 Censuses violate 5 U.S.C. § 706(2)(A).

CAUSES OF ACTION

## Count 1
## 2020 Census Violation of Section 2 of the Fourteenth Amendment
### (Congressional Apportionment)

172.    Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

173.    Under Section 2 of the Fourteenth Amendment, "Representatives shall be apportioned among the several States according to their respective numbers, counting the whole number of persons in each State, excluding Indians not taxed." U.S. Const. amend. XIV, § 2.

174.    The Residence Criteria for the 2020 Census, 83 Fed. Reg. 5525, violated the Fourteenth Amendment by causing the decennial apportionment to include illegal aliens and temporary visa holders. The inclusion of illegal aliens and temporary visa holders prevented apportionment "among the several States according to their respective numbers." U.S. Const. amend. XIV, § 2. Rather, the apportionment was based on an unconstitutional census tabulation that included temporary visa holders and illegal aliens in the population of each State.

175.    The Residence Criteria for the 2020 Census—and its implementation by the Department of Commerce and the Census Bureau—also undermined the Fourteenth Amendment's "goal of equal representation." *Franklin*, 505 U.S. at 804, 806. These actions artificially inflated the population of States with high numbers of illegal aliens and temporary visa holders. This caused unequal treatment of States with low numbers of illegal aliens and temporary visa holders.

176.    Thus, the Residence Criteria for the 2020 Census, 83 Fed. Reg. 5525—and its implementation by the Department of Commerce and the Census Bureau—violated the Fourteenth Amendment, and must be declared unconstitutional.  Further, to remedy Plaintiffs' ongoing injury, this Court must issue an injunction requiring Defendants to promulgate lawful Residence Criteria and to use the best available methods for to exclude illegal aliens and temporary visa holders from the census tabulation.

**Count 2**
**2021 Apportionment Violation of Section 2 of the Fourteenth Amendment**
**(Congressional Apportionment)**

177.    Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

178.    Under Section 2 of the Fourteenth Amendment, "Representatives shall be apportioned among the several States according to their respective numbers, counting the whole number of persons in each State, excluding Indians not taxed."  U.S. Const. amend. XIV, § 2.

179.    The 2021 Apportionment violated the Fourteenth Amendment by including illegal aliens and temporary visa holders in the apportionment base and awarding representation to the several States based on that tainted apportionment base.  This defied the Fourteenth Amendment's command that "Representatives shall be apportioned among the several States according to their respective numbers."  U.S. Const. amend. XIV, § 2.  Rather, the apportionment was based on an unconstitutional apportionment base that included citizens, legal residents, temporary visa holders, and illegal aliens.

180.    The 2021 Apportionment also undermined the Fourteenth Amendment's "goal of equal representation," *Franklin*, 505 U.S. at 806, because it artificially inflated the apportionment base of States with high numbers of illegal aliens and temporary visa holders.  This caused unequal treatment of States with low numbers of illegal aliens and temporary visa holders.

181.    Thus, the 2021 Apportionment violated the Fourteenth Amendment, and must be declared unconstitutional.  Further, to remedy Plaintiffs' ongoing injury, this Court must issue an injunction requiring Defendants to redo the 2021 Apportionment using the best available methods to exclude all illegal aliens and temporary visa holders from the apportionment base.

### Count 3
### 2020 Census Violation of Section 2 of the Fourteenth Amendment and Article II, § 1 (Electoral College Apportionment)

182.    Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

183.    Article II, § 1, provides that "Each State shall appoint, in such Manner as the Legislature thereof may direct, a Number of Electors, equal to the whole Number of Senators and Representatives to which the State may be entitled in the Congress." U.S. Const. art II, § 1, cl. 2.

184.    In other words, the number of House seats that each State is apportioned directly controls the number of electoral votes to which each State is entitled.  Therefore, when House seats are apportioned unlawfully under Section 2 of the Fourteenth Amendment and Article I, Section 2, presidential electors are likewise apportioned unlawfully under Article II, Section 1.

185.    The Residence Criteria for the 2020 Census, 83 Fed. Reg. 5525—and its implementation by the Department of Commerce and the Census Bureau—violate Article II, Section 1 by unlawfully including illegal aliens and temporary visa holders in the census tabulation used to apportion the House of Representatives, which in turn directly controlled the apportionment of Electors among the States.

186.    Thus, the Residence Criteria for the 2020 Census, 83 Fed. Reg. 5525—and its implementation by the Department of Commerce and the Census Bureau—must be declared unconstitutional under Article II, Section 1.  Further, to remedy Plaintiffs' ongoing injury, this Court must issue an injunction requiring Defendants to promulgate lawful Residence Criteria and to use the best available methods to exclude illegal aliens and temporary visa holders from the census tabulation.

### Count 4
### 2021 Apportionment Violation of Section 2 of the Fourteenth Amendment and Article II, § 1 (Electoral College Apportionment)

187.    Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

188.    Article II, § 1, provides that "Each State shall appoint, in such Manner as the Legislature thereof may direct, a Number of Electors, equal to the whole Number of Senators and Representatives to which the State may be entitled in the Congress." U.S. Const. art II, § 1, cl. 2.

189.    In other words, the number of House seats that each State is apportioned directly controls the number of electoral votes to which each State is entitled.  Therefore, when House seats are apportioned unlawfully under Section 2 of the Fourteenth

Amendment and Article I, Section 2, presidential electors are likewise apportioned unlawfully under Article II, Section 1.

190.    The 2021 Apportionment violated Article II, Section 1 by unlawfully including illegal aliens and temporary visa holders in the apportionment base used to award seats in the House of Representatives, which in turn directly controlled the apportionment of Electors among the States.

191.    Thus, the 2021 Apportionment must be declared unconstitutional under Article II, Section 1.  Further, to remedy Plaintiffs' ongoing injury, this Court must issue an injunction requiring Defendants to redo the 2021 Apportionment using the best available methods to exclude all illegal aliens from the apportionment base.

### Count 5
### 2020 Census Violation of the APA (Contrary to Law)

192.    Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

193.    The APA requires this Court to "compel agency action unlawfully withheld" and to "hold unlawful and set aside" any agency action that is "contrary to constitutional right, power, privilege, or immunity" or that is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(1), (2)(B), (2)(C).

194.    Properly interpreted, Article I, Section 2, Article II, Section 1, Section 2 of the Fourteenth Amendment, 13 U.S.C. § 141(b) and 2 U.S.C. § 2a require a census enumeration of only citizens and legal permanent residents of the United States and an apportionment of congressional seats and Electoral College votes predicated on that population base.

195.   The Residence Criteria for the 2020 Census, 83 Fed. Reg. 5525—and its implementation by the Department of Commerce and the Census Bureau—violated these constitutional and statutory requirements by allocating illegal aliens and temporary visa holders to the States where they usually live and sleep.

196.   Because the Residence Criteria for the 2020 Census, 83 Fed. Reg. 5525—and its implementation by the Department of Commerce and the Census Bureau—exceed the Department of Commerce and the Census Bureau's authority under those statutes and are contrary to their requirements, the Residence Criteria violates 5 U.S.C. § 706(1), (2)(B), and (2)(C).

197.   Additionally, under 5 U.S.C. § 706(1), (2)(B), and (2)(C), this Court must "set aside" the 2020 Residence Criteria and associated agency action, 83 Fed. Reg. 5525, and "compel" a new census tabulation that excludes illegal aliens and temporary visa holders from the population count through the best available methods.

### Count 6    (Pled in the Alternative to Count 5)
### 2020 Census Violation of the APA (Arbitrary, Capricious, and an Abuse of Discretion)

198.   Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

199.   The APA requires this Court to hold "unlawful and set aside" any agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

200.   The Residence Criteria for the 2020 Census, 83 Fed. Reg. 5525—and its implementation by the Department of Commerce and the Census Bureau—are arbitrary and capricious because the Defendants failed to give any explanation of their decision to

incorporate illegal aliens and temporary visa holders into the census tabulation or meaningfully respond to comments calling for the exclusion of illegal aliens from the population totals. The Residence Criteria for the 2020 Census and associated agency action, 83 Fed. Reg. 5525, are also substantively unreasonable, self-contradictory, and unprincipled.

201.    Because the Residence Criteria and associated agency actions are arbitrary and capricious, they violate 5 U.S.C. § 706(2)(A) and must be held unlawful and set aside. The Court must also "compel" a new census tabulation that excludes illegal aliens and temporary visa holders from the population count through the best available methods. *Id.* § 706(1).

## Count 7
### 2030 Census Violation of Section 2 of the Fourteenth Amendment
### (Congressional Apportionment)

202.    Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

203.    Under Section 2 of the Fourteenth Amendment, "Representatives shall be apportioned among the several States according to their respective numbers, counting the whole number of persons in each State, excluding Indians not taxed." U.S. Const. amend. XIV, § 2.

204.    The Residence Criteria for the 2030 Census violate the Fourteenth Amendment by causing the upcoming decennial apportionment to include illegal aliens and temporary visa holders. The inclusion of illegal aliens and temporary visa holders will prevent apportionment "among the several States according to their respective numbers." U.S. Const. amend. XIV, § 2. Rather, the apportionment will be based on an

89

unconstitutional census tabulation that includes temporary visa holders and illegal aliens in the population of each State.

205.    The Residence Criteria for the 2030 Census will also undermine the Fourteenth Amendment's "goal of equal representation," *Franklin*, 505 U.S. at 804, 806, because they will artificially inflate the population of States with high numbers of illegal aliens and temporary visa holders.  This will cause unequal treatment of States with low numbers of illegal aliens and temporary visa holders.

206.    Thus, the Residence Criteria for the 2030 Census violate the Fourteenth Amendment, and must be declared unconstitutional.   Further, any agency action implementing the 2030 Residence Criteria must be enjoined.

### Count 8
### 2031 Apportionment Violation of Section 2 of the Fourteenth Amendment (Congressional Apportionment)

207.    Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

208.    Under Section 2 of the Fourteenth Amendment, "Representatives shall be apportioned among the several States according to their respective numbers, counting the whole number of persons in each State, excluding Indians not taxed."  U.S. Const. amend. XIV, § 2.

209.    The 2031 Apportionment will violate the Fourteenth Amendment by including illegal aliens and temporary visa holders in the apportionment base and awarding representation to States based on that tainted apportionment base.  This defies the Fourteenth Amendment's command that "Representatives shall be apportioned among the several States according to their respective numbers."  U.S. Const. amend. XIV, § 2.

Rather, the apportionment will be based on an unconstitutional apportionment base that included temporary visa holders and illegal aliens.

210.   The 2031 Apportionment will also undermine the Fourteenth Amendment's "goal of equal representation," *Franklin*, 505 U.S. at 804, 806, because it will artificially inflate the apportionment base of States with high numbers of illegal aliens and temporary visa holders.  This will cause unequal treatment of States with low numbers of illegal aliens and temporary visa holders.

211.   Thus, the 2031 Apportionment will violate the Fourteenth Amendment, and must be declared unconstitutional.

### Count 9
### 2030 Census Violation of Section 2 of the Fourteenth Amendment and Article II, § 1 (Electoral College Apportionment)

212.   Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

213.   Article II, § 1, provides that "Each State shall appoint, in such Manner as the Legislature thereof may direct, a Number of Electors, equal to the whole Number of Senators and Representatives to which the State may be entitled in the Congress." U.S. Const. art II, § 1, cl. 2.

214.   In other words, the number of House seats that each State is apportioned directly controls the number of electoral votes to which each State is entitled.  Therefore, when House seats are apportioned unlawfully under Section 2 of the Fourteenth Amendment and Article I, Section 2, presidential electors are likewise apportioned unlawfully under Article II, Section 1.

215.   The Residence Criteria for the 2030 Census violate Article II, Section 1 by unlawfully including illegal aliens and temporary visa holders in the census tabulation used to apportion the House of Representatives, which in turn will directly control the apportionment of Electors among the States.

216.   Thus, the Residence Criteria for the 2030 Census must be declared unconstitutional under Article II, Section 1.   Further, any agency action implementing the 2030 Residence Criteria must be enjoined.

### Count 10
### 2031 Apportionment Violation of Section 2 of the Fourteenth Amendment and Article II, § 1 (Electoral College Apportionment)

217.   Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

218.   Article II, § 1, provides that "Each State shall appoint, in such Manner as the Legislature thereof may direct, a Number of Electors, equal to the whole Number of Senators and Representatives to which the State may be entitled in the Congress." U.S. Const. art II, § 1, cl. 2.

219.   In other words, the number of House seats that each State is apportioned directly controls the number of electoral votes to which each State is entitled.  Therefore, when House seats are apportioned unlawfully under Section 2 of the Fourteenth Amendment and Article I, Section 2, presidential electors are likewise apportioned unlawfully under Article II, Section 1.

220.   The 2031 Apportionment will violate Article II, Section 1 by unlawfully including illegal aliens and temporary visa holders in the apportionment base used to

award seats in the House of Representatives, which in turn will directly control the apportionment of Electors among the States.

221.   Thus, the 2031 Apportionment must be declared unconstitutional under Article II, Section 1.

## Count 11
## 2030 Census Violation of the APA (Contrary to Law)

222.   Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

223.   The APA requires this Court to "hold unlawful and set aside" any agency action that is "contrary to constitutional right, power, privilege, or immunity" or that is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(B), (2)(C).

224.   Properly interpreted, Article I, Section 2, Article II, Section 1, Section 2 of the Fourteenth Amendment, 13 U.S.C. § 141(b) and 2 U.S.C. § 2a require a census enumeration of only citizens and legally permanent residents of the United States and an apportionment of congressional seats and Electoral College votes predicated on that population base.

225.   The Residence Criteria for the 2030 Census violate these constitutional and statutory requirements by allocating illegal aliens and temporary visa holders to the States where they usually live and sleep.

226.   Because the Residence Criteria for the 2030 Census exceed the Department of Commerce and the Census Bureau's authority under those statutes and are contrary to their requirements, the Residence Criteria violates 5 U.S.C. § 706(2)(B) and (2)(C).

93

227.   Additionally, under 5 U.S.C. § 706(2)(B) and (2)(C), this Court must "hold unlawful and set aside" the 2030 Residence Criteria.

### Count 12  (Pled in the Alternative to Count 11)
### 2030 Census Violation of the APA (Arbitrary, Capricious, and an Abuse of Discretion)

228.   Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

229.   The APA requires this Court to hold "unlawful and set aside" any agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

230.   The Residence Criteria for the 2030 Census are arbitrary and capricious because the Defendants failed to give any explanation of their decision to incorporate illegal aliens and temporary visa holders into the census tabulation.  The Residence Criteria for the 2030 Census are also substantively unreasonable, self-contradictory, and unprincipled.

231.   Because the Residence Criteria is arbitrary and capricious, it violates 5 U.S.C. § 706(2)(A) and must be held unlawful and set aside.

### PRAYER FOR RELIEF

Plaintiffs respectfully request that this Court:

1.   Convene a three-judge district court under 28 U.S.C. § 2284;

2.   Enter a declaratory judgment, pursuant to 28 U.S.C. §§ 2201, 2202 and 5 U.S.C. § 706, declaring that including illegal aliens and temporary visa holders in the 2020 Census and the 2021 Apportionment base violated Section 2 of the Fourteenth Amendment;  the Census Clause of Article I, Section 2;  the Electoral College

94

Apportionment Clause of Article II, Section I; 2 U.S.C. § 2a; 13 U.S.C. § 141; and § 706 of the Administrative Procedure Act;

3.      Enter a declaratory judgment, pursuant to 28 U.S.C. §§ 2201, 2202 and 5 U.S.C. § 706, declaring that including illegal aliens and temporary visa holders in the 2030 Census and the 2031 Apportionment base would violate Section 2 of the Fourteenth Amendment; the Census Clause of Article I, Section 2; the Electoral Apportionment Clause of Article II, Section I; 2 U.S.C. § 2a; 13 U.S.C. § 141; and § 706 of the Administrative Procedure Act;

4.      Enter a preliminary and permanent injunction requiring Defendants to redo the 2020 Census and 2021 Apportionment, removing from the apportionment base all illegal aliens and temporary visa holders through the best available methods, including by re-conducting the 2020 census enumeration if necessary; to recalculate a new apportionment of seats in the House of Representatives; and to submit that apportionment calculation to the President for subsequent transmittal to the clerk of the House and, from him, to the States;

5.      Enter an injunction prohibiting Defendants from including illegal aliens and temporary visa holders in the 2030 census tabulation;

6.      Enter an injunction requiring Defendants to conduct the 2030 Census using the best available methods to detect and exclude illegal aliens and temporary visa holders from the enumeration;

7.      Enter an injunction prohibiting Defendants from including illegal aliens and temporary visa holders in the 2031 Apportionment base;

8.    Enter an injunction requiring Defendants to calculate the 2031 Apportionment of seats in the House of Representatives by using the best available methods to exclude illegal aliens and temporary visa holders from the apportionment base;

9.    Remand this case to the Department of Commerce and the Census Bureau, to permit the Defendants to issue rules that comply with the Constitution, the APA, and governing statutes; and

10.    Award all other relief this Court deems equitable and just.

Dated: January 30, 2026                 Respectfully submitted,


**CATHERINE L. HANAWAY**
MISSOURI ATTORNEY GENERAL

/s/ *Louis J. Capozzi III*
Louis J. Capozzi III, #77756(MO)
   *Solicitor General*
Kathleen Hunker, #24118415(TX)
   *Principal Deputy Solicitor General*
William J. Seidleck, #77794(MO)
   *Principal Deputy Solicitor General*
J. Michael Patton, #76490(MO)
   *Deputy Solicitor General*
Graham Miller, #77656(MO)
   *Deputy Solicitor General*

OFFICE OF THE ATTORNEY GENERAL
207 West High Street
Jefferson City, MO 65102
Phone: (573) 645-9662
Louis.Capozzi@ago.mo.gov
Kathleen.Hunker@ago.mo.gov
William.Seidleck@ago.mo.gov
Michael.Patton@ago.mo.gov
Graham.Miller@ago.mo.gov

*Counsel for Plaintiffs*