# UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF MISSOURI

## EASTERN DIVISION

| | |
|---|---|
| STATE OF MISSOURI, DAVID MASON, ANDREA MCCANN, JESSICA FISHER, AND PHILLIP FISHER, <br><br>            *Plaintiffs*, <br><br>    v. <br><br><br> UNITED STATES DEPARTMENT OF COMMERCE, HOWARD W. LUTNICK in his official capacity as Secretary of Commerce, UNITED STATES CENSUS BUREAU, GEORGE COOK in his official capacity as Acting Director of the U.S. Census Bureau., <br><br><br>            *Defendants*. | No. 4:26-cv-00131 (JAR) |

**[PROPOSED] MEMORANDUM IN SUPPORT OF MOTION TO DISMISS OF INTERVENOR-DEFENDANTS OCA-ASIAN PACIFIC AMERICAN ADVOCATES, MAKE THE ROAD NEW YORK, NEW YORK IMMIGRATION COALITION, AND FIEL HOUSTON**

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................. 1

ARGUMENT ...................................................................................................................... 2

I.   Plaintiffs' Challenges to the 2020 Census Must Be Dismissed........................................ 2

    A.   Plaintiffs Lack Standing to Challenge the 2020 Census Because Their Injuries Are Not Redressable........................................................................ 2

        1.   This Court Cannot Grant Plaintiffs' Requested Relief Under *Utah v. Evans*. ........................................................................................ 2

        2.   This Court Cannot Grant Plaintiffs' Requested Relief Based on Impermissible Population Estimates. ............................................... 4

        3.   This Court Cannot Grant Plaintiffs' Requested Relief By Ordering a New Census. .......................................................................... 6

    B.   Plaintiffs' Claims Are Time-Barred ............................................................. 7

        1.   Missouri's APA Claims Are Untimely Under the Six-Year Statute of Limitations. ........................................................................ 7

        2.   Plaintiffs' Equitable Claims Are Barred by Laches. ........................... 8

II.  Plaintiffs' Challenges to the 2030 Census Must Be Dismissed........................................ 9

    A.   Plaintiffs' APA Claims Fail for Lack of Final Agency Action ................................. 9

    B.   Plaintiffs Lack Standing to Challenge the 2030 Census ........................................... 11

    C.   Plaintiffs' Claims Against the 2030 Census Are Not Ripe ....................................... 14

III. The Missouri Attorney General Lacks Statutory Authority to Bring Claims on Behalf of the Individual Plaintiffs. .................................................................. 15

CONCLUSION................................................................................................................ 15

i

# TABLE OF AUTHORITIES

**Cases**

*Alabama v. United States Department of Commerce*,
396 F. Supp. 3d 1044 (N.D. Ala. 2019) .................................................. 8

*Alabama v. United States Department of Commerce*,
No. 2:18-cv-772 (N.D. Ala. May 3, 2021) ............................................. 8

*Bellitto v. Snipes*,
No. 16-cv-61474 (S.D. Fla. Mar. 30, 2018) ......................................... 14

*Bennett v. Spear*,
520 U.S. 154 (1997) ............................................................................. 9

*City of South Miami v. DeSantis*,
561 F. Supp. 3d 1211 (S.D. Fla. 2021) ............................................... 14

*City of South Miami v. Governor*,
65 F.4th 631 (11th Cir. 2023) ............................................................ 14

*Clapper v. Amnesty International USA*,
568 U.S. 398 (2013) ..................................................................... 11, 13

*Cobell v. Kempthorne*,
455 F.3d 301 (D.C. Cir. 2006) ........................................................... 10

*Collins v. Yellen*,
594 U.S. 220 (2021) ........................................................................... 15

*Corner Post, Incorporated v. Board of Governors of Federal Reserve System*,
603 U.S. 799 (2024) ............................................................................. 7

*Department of Commerce v. New York*,
588 U.S. 752 (2019) ......................................................................... 1, 5

*Department of Commerce v. United States House of Representatives*,
525 U.S. 316 (1999) ............................................................................. 4

*Flue-Cured Tobacco Cooperative Stabilization Corporation v. Environmental Protection Agency*,
313 F.3d 852 (4th Cir. 2002) ............................................................. 11

*Food and Drug Administration v. Alliance for Hippocratic Medicine*,
602 U.S. 367 (2024) ........................................................................... 11

*Franklin v. Massachusetts*,
505 U.S. 788 (1992) ....................................................................... 3, 11

*Gonzales v. Gorsuch*,
688 F.2d 1263 (9th Cir. 1982) ............................................................. 2

ii

*Green v. Brennan*,
  578 U.S. 547 (2016) ............................................................................................................. 7

*Hubbard Feeds, Incorporated v. Animal Feed Supplement, Inc.*,
  182 F.3d 598 (8th Cir. 1999) ............................................................................................... 8

*In re SuperValu, Inc.*,
  870 F.3d 763 (8th Cir. 2017) ............................................................................................. 11

*Izaak Walton League of America, Inc. v. Kimbell*,
  558 F.3d 751 (8th Cir. 2009) ............................................................................................... 7

*Levy v. Ohl*,
  477 F.3d 988 (8th Cir. 2007) ............................................................................................... 3

*Lujan v. Defenders of Wildlife*,
  504 U.S. 555 (1992) ............................................................................................................. 2

*Massachusetts v. Mosbacher*,
  785 F. Supp. 230 (D. Mass. 1992) ...................................................................................... 3

*Missouri v. Starbucks Corp.*,
  No. 4:25-cv-165, 2026 WL 309714 (E.D. Mo. Feb. 5, 2026) .......................................... 15

*Mosby v. Ligon*,
  418 F.3d 927 (8th Cir. 2005) ............................................................................................. 11

*Murthy v. Missouri*,
  603 U.S. 43 (2024) ............................................................................................................. 15

*National Association for the Advancement of Colored People v. Bureau of Census*,
  382 F. Supp. 3d 349 (D. Md. 2019) ..................................................................................... 4

*National Urban League v. Ross*,
  977 F.3d 698 (9th Cir. 2020) ............................................................................................... 4

*O'Shea v. Littleton*,
  414 U.S. 488 (1974) ........................................................................................................... 11

*Piccolo v. New York City Campaign Finance Board*,
  No. 05-cv-7040, 2007 WL 2844939 (S.D.N.Y. Sept. 28, 2007) ........................................ 3

*Pueblo of Santa Rosa v. Fall*,
  273 U.S. 315 (1927) ........................................................................................................... 15

*Roederer v. J. Garcia Carrion, S.A.*,
  569 F.3d 855 (8th Cir. 2009) ............................................................................................... 8

*State ex inf. McKittrick v. American Colony Insurance Company*,
  80 S.W.2d 876 (Mo. 1934) ................................................................................................ 15

*State ex rel. Barker v. Chicago & Alton Railroad Company*,
  178 S.W. 129 (Mo. 1915) .................................................................................................. 15

iii

*Susan B. Anthony List v. Driehaus*,
  573 U.S. 149 (2014).................................................................................... 14

*Texas v. United States*,
  523 U.S. 296 (1998)................................................................................ 11, 14

*Trump v. New York*,
  592 U.S. 125 (2020)................................................................ 10, 12, 14, 15

*Tyler v. Murphy*,
  135 F.3d 594 (8th Cir. 1998) ......................................................................... 7

*United States Department of Commerce v. Montana*,
  503 U.S. 442 (1992)........................................................................................ 3

*United States v. Oakland Cannabis Buyers' Co-op.*,
  532 U.S. 483 (2001)........................................................................................ 2

*University of South Florida College Republicans v. Lutnick*,
  No. 8:25-cv-2486 (M.D. Fla. Feb. 3, 2026).............................................. 8

*Utah v. Evans*,
  536 U.S. 452 (2002)......................................................................... 2, 3, 4, 6

## Constitutional and Statutory Authorities

United States Constitution, article I, § 2, clause 3 ................................ 1, 4, 12

2 U.S.C. § 2a ..................................................................................................... 2

5 U.S.C. § 704 ............................................................................................... 7, 9

13 U.S.C. § 141 ................................................................................................ 2

13 U.S.C. § 141(a) ........................................................................................... 6

13 U.S.C. § 141(b) ........................................................................................... 4

13 U.S.C. § 141(e)(2)........................................................................................ 6

13 U.S.C. § 141(f) ............................................................................................ 6

13 U.S.C. § 195 ................................................................................................ 4

28 U.S.C. § 2401(a) ......................................................................................... 7

Mo. Rev. Stat. § 27.060 ................................................................................. 15

## Other Authorities

Bryan Baker & Robert Warren, United States Department of Homeland Security,
  *Estimates of the Unauthorized Immigrant Population Residing in the United States:*
  *January 2018–January 2022* (2024)............................................................ 5

Jason Mazzone & Stephen Rushin,
*State Attorneys General as Agents of Police Reform*, 69 Duke L.J. 999 (2020) ................... 15

North Carolina State Board Of Elections, 2026 North Carolina Elections,
https://perma.cc/2YUF-VT5V ................................................................................................. 3

**Regulations**

2020 Decennial Census Residence Rule and Residence Situations,
80 Fed. Reg. 28950 (May 20, 2015) ...................................................................... 12

Final 2020 Census Residence Criteria and Residence Situations,
83 Fed. Reg. 5525 (Feb. 8, 2018) ...................................................................... 7, 12

85 Fed. Reg. 44679 (July 21, 2020) ........................................................................... 12

**INTRODUCTION**

"In order to apportion Members of the House of Representatives among the States, the Constitution requires an 'Enumeration' of the population every 10 years." *Dep't of Com. v. New York*, 588 U.S. 752, 758 (2019) (quoting U.S. Const. art. I, § 2, cl. 3). Since 1790, every Decennial Census has counted everyone living in the country, regardless of legal status, and every congressional apportionment has followed that same principle including the 2020 Census and the 2021 Apportionment. Now, six years after the count, five years after apportionment, and two federal election cycles later, the Attorney General of Missouri asks this Court to discard centuries of settled practice and exclude millions of people who live and work here, pay taxes, send their children to school, and participate in their communities by counting only U.S. citizens and lawful permanent residents. That unlawful request would distort representation for millions of Americans and shake the foundations of our representative democracy. This Court should reject it.

This Court need not reach the merits to dismiss this case with prejudice for several reasons. Plaintiffs' backward-looking claims fail for lack of standing. Excluding people from the 2020 Apportionment would require re-counting them as of April 1, 2020—an impossible task under the circumstances here without violating the Census Act and Constitution. And Plaintiffs' request that this Court order a multi-billion-dollar count would require hiring and training hundreds of thousands of employees. That is a nonstarter; there is no legal authority that permits such a mid-decade re-count or re-apportionment.

The claims are also untimely. Missouri's time to challenge the 2020 Census enumeration rule expired in 2024. Perhaps recognizing this defect, Missouri's Attorney General tries to manufacture live claims by also purporting to sue on behalf of four residents who moved to the

State after the 2020 Census. But the Attorney General lacks authority to represent private citizens, so those claims fail as a matter of law.

Finally, Plaintiffs' forward-looking challenges to the 2030 census are unripe because the Census Bureau has not set the rules for that count, and Plaintiffs have failed to plausibly allege that counting everyone will cause it any harm. The Complaint should be dismissed.

## ARGUMENT

### I.  Plaintiffs' Challenges to the 2020 Census Must Be Dismissed.

#### A.  Plaintiffs Lack Standing to Challenge the 2020 Census Because Their Injuries Are Not Redressable.

Plaintiffs seek an injunction requiring Defendants to redo the 2020 Census and 2021 Apportionment; exclude undocumented noncitizens and visa holders from the apportionment base; and reapportion House seats. Compl. at 95 ¶ 4. But to satisfy Article III standing, "it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992) (internal quotation marks omitted). In other words, a court must have "the power to right or to prevent the claimed injury," *Gonzales v. Gorsuch*, 688 F.2d 1263, 1267 (9th Cir. 1982), and a court cannot fashion an equitable remedy that "ignore[s] the judgment of Congress, deliberately expressed in legislation," *United States v. Oakland Cannabis Buyers' Co-op.*, 532 U.S. 483, 497 (2001) (internal quotation marks omitted). Because this Court does not have the power to grant Plaintiffs' requested relief, their purported injuries as to the 2020 Census and 2021 Apportionment are not redressable.

##### 1.  This Court Cannot Grant Plaintiffs' Requested Relief Under *Utah v. Evans*.

Federal law imposes strict timing and procedural requirements for the Decennial Census and Apportionment. *See* 13 U.S.C. § 141; 2 U.S.C. § 2a. In *Utah v. Evans*, the Supreme Court recognized that in a post-enumeration challenge to the resulting apportionment, these timing

2

provisions may be "open to a more flexible reading"—but only in limited circumstances, where a "serious mistake" may "permit correction of a certificate." 536 U.S. 452, 462 (2002). The conditions for the exception outlined in *Utah* are not met here for two reasons.

*First*, *Utah* requires that the supposed serious apportionment mistake be "uncovered before new [congressional] Representatives are actually selected." *Id.* No court has ever granted relief in an apportionment challenge *after* a congressional election was held. For example, in *Franklin v. Massachusetts*, 505 U.S. 788 (1992), plaintiffs challenged the 1991 Apportionment five months after its completion, and a court granted relief (reversed on appeal) before any elections occurred under that apportionment. *See Massachusetts v. Mosbacher*, 785 F. Supp. 230, 267 (D. Mass. 1992); *see also, e.g.*, *Utah*, 536 U.S. 452 (challenge to 2001 Apportionment six days after President transmitted census numbers to the House); *U.S. Dep't of Com. v. Montana*, 503 U.S. 442 (1992) (challenge to 1991 Apportionment less than five months after President transmitted census numbers to the House and nearly a year-and-a-half before the 1992 congressional general election). Here, by contrast, Plaintiffs sue *five years* after the apportionment process ended, after *two* congressional elections have been held with the resulting apportionment and while ballots *are already being cast* in a third.[1] That delay puts this case well outside the narrow *Utah* exception.

*Second*, *Utah*'s exception applies only where correction can occur "without further need for exercise of policy judgment"—that is, where the alleged error is a simple, ministerial mistake, such as "clerical, [] mathematical, or [] calculation" mistakes that can be corrected "mechanically."

---

[1] *See* N. Carolina State Bd. Of Elections, 2026 North Carolina Elections, https://perma.cc/2YUF-VT5V; *see also Levy v. Ohl*, 477 F.3d 988 (8th Cir. 2007) (district court may take judicial notice of public state records); *Piccolo v. N.Y.C. Campaign Fin. Bd.*, No. 05-cv-7040, 2007 WL 2844939, at *2 n.2 (S.D.N.Y. Sept. 28, 2007) (taking judicial notice of "matters in the public record . . . such as election dates").

536 U.S. at 462. Plaintiffs' claim rests not on a technical error, but on a request for this Court to ignore the plain language of the Constitution and federal statute by not counting undocumented immigrants and visa holders in the apportionment base. Their proposed recalculation seeks not to correct a mistake, but to reverse centuries of unbroken practice and effect a fundamental change in Census policy. Even attempting to procure the necessary data exceeds any plausible definition of a ministerial correction. It would require countless "policy judgment[s]," *see Utah*, 536 U.S. at 462, about what data to use, what calculations to make, what formulas to use, and the reasonableness of certain datasets and estimates with margins of error, just to name a few. Plaintiffs effectively concede the point by suggesting the Court could order Defendants to "re-conduct[] the 2020 census enumeration if necessary," Compl. at 95 ¶ 4—an extraordinary and unprecedented undertaking, far removed from the clerical or ministerial corrections contemplated in *Utah*. Indeed, conducting a census is "an enormous and complex nationwide operation." *Nat'l Urb. League v. Ross*, 977 F.3d 698, 700 (9th Cir. 2020). A redo would require the government to hire "hundreds of thousands of dedicated workers," *id.*, with costs in the billions of dollars, *see NAACP v. Bureau of Census*, 382 F. Supp. 3d 349, 360 (D. Md. 2019).

## 2. This Court Cannot Grant Plaintiffs' Requested Relief Based on Impermissible Population Estimates.

Regardless of timing and the magnitude of the purported "correction," Plaintiffs' requested relief is foreclosed because it impermissibly would require apportionment to be based on estimated population data, rather than an actual enumeration. The Census Act expressly prohibits "the use of the statistical method known as 'sampling'" for apportionment, 13 U.S.C. § 195, and the Constitution requires an "'actual Enumeration' of the population," for the apportionment base. *Dep't of Com. v. U.S. House of Representatives*, 525 U.S. 316, 321 (1999) (quoting U.S. Const. art. I, § 2, cl. 3); 13 U.S.C. § 141(b).

4

The 2020 Census contains no citizenship or immigration data, which would be necessary to implement Plaintiffs' proposed exclusion, and no external source supplies such data. The only sources Plaintiffs identify—the Department of Homeland Security ("DHS") and the American Community Survey ("ACS"), Compl. ¶¶ 98–99 & nn.28, 30—do not provide the constitutionally required "actual [e]numeration," but instead produce *estimates* with margins of error. DHS explains that its "[a]nnual estimates of the unauthorized population are subject to sampling error in the ACS and considerable non-sampling error because of uncertainty in some of the assumptions required for estimation."[2] DHS further acknowledges that its estimates of foreign-born U.S. residents are "subject to sampling variability," and that "analysts must make assumptions about the extent of the undercount [of foreign-born Americans] and then adjust the ACS survey estimates accordingly."[3] Likewise, the ACS is a survey "sent each year to a rotating sample of about 2.6% of households," *Dep't of Com. v. New York*, 588 U.S. 752, 761 (2019), and therefore yields estimates with margins of error, *see* Trende Rep. at 6.

Even if estimates were constitutionally permitted for this purpose—which they are not—the data upon which Plaintiffs' allegations rest are too old to estimate the 2020 population. Plaintiffs' experts use (i) 2016–2020 ACS 5-year estimates and (ii) DHS data from 2013–2020. *See* Kincaid Rep. at 7–13 & fig.1; Trende Rep. at 6. But these data sets do not reflect the actual foreign-born and citizen population in 2020. The ACS 5-year estimates on which Plaintiffs' experts rely have a midpoint of 2018 and include data from as far back as 2016, meaning that 80 percent of the underlying sample on which those estimates are based is *not* from the year 2020.

---

[2] Bryan Baker & Robert Warren, U.S. Dep't of Homeland Sec., *Estimates of the Unauthorized Immigrant Population Residing in the United States: January 2018–January 2022* (2024), https://perma.cc/4KS3-Z7N2.

[3] *Id.*

The DHS data are even less contemporaneous, incorporating figures from as far back as 2013.

Recognizing that the 2020 Census contains no citizenship or immigration data—and that no such data exist—Plaintiffs ask the Court to order the federal government to rely on "best available methods." Compl. at 95 ¶ 4. But hoping for the data to magically materialize cannot create the "actual [e]numeration" the Constitution requires.

### 3. This Court Cannot Grant Plaintiffs' Requested Relief By Ordering a New Census.

Plaintiffs' fallback request—a redo of the 2020 Census—is itself unlawful. The Constitution's "actual [e]numeration" mandate requires the Census Bureau to make "all efforts . . . to reach every household." *Utah*, 536 U.S. at 479. But there is no way for the Census Bureau to reach every household as it existed in 2020. Moreover, any recount conducted now would necessarily constitute a mid-decade census, which Congress has expressly barred from being used for apportionment. *See* 13 U.S.C. § 141(e)(2).

Nor could this Court order a redo of the 2020 enumeration at this late date. As explained above, *Utah*'s limited exception to federal law's timing requirements applies only in narrow circumstances that are not met here. *See supra* § I.A.1. A redo now—five years and now in a third election cycle after completion—would violate the Census Act in multiple additional ways. First, the Act commands that the Secretary of Commerce "shall, in the year 1980 and every 10 years thereafter, take a decennial census of population *as of the first day of April of such year*," 13 U.S.C. § 141(a) (emphasis added), with the Decennial Census tabulation for apportionment to be completed within nine months of the census date, *id.* § 141(b). Neither of those conditions would be met. Second, the Act requires the Secretary to report proposed subjects to be included in the census three years in advance, and proposed questions to be included in the census two years in advance. *Id.* § 141(f). Even if this Court granted Plaintiffs' relief tomorrow, and the Secretary

6

prepared his first report required by Section 141(f) the next day, the enumeration could not begin until sometime in 2029, a year before the 2030 Decennial Census required by Section 141(a). And for Plaintiffs to obtain their desired relief, they would also need to retroactively change the 2020 census form itself, given that the 2020 form does not ask any questions about citizenship or legal status and thus cannot yield the data Plaintiffs need to effectuate their relief. The relief Plaintiffs belatedly seek is legally and practically impossible. *See generally Tyler v. Murphy*, 135 F.3d 594, 597 (8th Cir. 1998) ("Federal courts are courts of limited jurisdiction").

The Complaint shows there is no legal means to redress the alleged injuries arising from the 2020 Census and 2021 Apportionment. Those claims must be dismissed for lack of standing.

## B. Plaintiffs' Claims Are Time-Barred

### 1. Missouri's APA Claims Are Untimely Under the Six-Year Statute of Limitations.

The default statute of limitations for APA claims requires that "the complaint [be] filed within six years after the right of action first accrues." 28 U.S.C. § 2401(a); *see also Izaak Walton League of Am., Inc. v. Kimbell*, 558 F.3d 751, 758 (8th Cir. 2009) ("The statute of limitations set forth in 28 U.S.C. § 2401(a) . . . applies" to "claims under the [APA]."). A claim accrues "when the plaintiff has a 'complete and present cause of action'—*i.e.*, when [it] has the right to 'file suit and obtain relief.'" *Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 603 U.S. 799, 809 (2024) (quoting *Green v. Brennan*, 578 U.S. 547, 554 (2016)).

Missouri's APA claims against the 2020 Census are time-barred. Missouri challenges the Census Bureau's Residence Criteria for the 2020 Census, which were promulgated on February 8, 2018. *See* Compl. ¶¶ 174, 185, 195, 200; *Final 2020 Census Residence Criteria and Residence Situations*, 83 Fed. Reg. 5525 (Feb. 8, 2018) ("2020 Residence Criteria"). Because the 2020 Residence Criteria constituted final agency action reviewable under the APA, 5 U.S.C. § 704,

7

Missouri had the "right to file suit and obtain relief" as of that day. *Corner Post*, 603 U.S. at 809 (internal quotation marks omitted). Indeed, Alabama challenged the 2020 Residence Criteria in May 2018, and a court found its claims justiciable, *Alabama v. U.S. Dep't of Com.*, 396 F. Supp. 3d 1044, 1058 (N.D. Ala. 2019), before the State voluntarily dismissed the case, No. 2:18-cv-772 (N.D. Ala. May 3, 2021), Dkt. No. 213. The six-year limitations period therefore expired on February 8, 2024. Missouri did not file suit until ten days ago—two years late—so its claims are untimely and must be dismissed. *See, e.g.*, Op. & Order, *Univ. of S. Fla. Coll. Republicans v. Lutnick*, No. 8:25-cv-2486 (M.D. Fla. Feb. 3, 2026), Dkt. No. 84 (dismissing challenge to the 2020 Census as untimely).[4]

## 2. Plaintiffs' Equitable Claims Are Barred by Laches.

Plaintiffs' remaining claims are barred under the equitable doctrine of laches. "Laches applies when a claimant inexcusably delays in asserting its claim and thereby unduly prejudices the party against whom the claim ultimately is asserted." *Roederer v. J. Garcia Carrion, S.A.*, 569 F.3d 855, 858–59 (8th Cir. 2009) (internal quotation marks omitted). The doctrine requires three elements: "(1) a delay in asserting a right or a claim; (2) that the delay was not excusable; and (3) that there was undue prejudice to the party against whom the claim is asserted." *Id.* (citation omitted).

*First*, Plaintiffs unreasonably delayed in asserting their claims. The 2020 Residence Criteria were promulgated in February 2018, when, as discussed above, Plaintiffs could have brought a pre-enforcement challenge. At the latest, the Individual Plaintiffs could have sued in 2022, after moving to Missouri and acquiring the interests they now assert—yet they waited four-

---

[4] As discussed below, *see infra* Section III, the Individual Plaintiffs' claims must be dismissed because the Missouri Attorney General lacks authority to represent them.

to-six more years to file this action. *Hubbard Feeds, Inc. v. Animal Feed Supplement, Inc.*, 182 F.3d 598, 602 n.5 (8th Cir. 1999) ("[A] delay of over four years is sufficient for laches.").

*Second*, Plaintiffs offer no excuse for that delay. Other plaintiffs promptly challenged the same rule: Alabama sued in 2018, as noted, and Louisiana, Kansas, Ohio, and West Virginia brought a similar challenge more than a year ago. *See Alabama v. U.S. Dep't of Com.*, No. 2:18-cv-772 (N.D. Ala. May 21, 2018); *Louisiana v. U.S. Dep't of Com.*, No. 6:25-cv-76 (W.D. La. Jan. 17, 2025). Plaintiffs' decision to sit on their rights while others litigated confirms that the delay was not unavoidable or justified.

*Third*, the delay will cause substantial prejudice. Had Plaintiffs brought their claims before the 2020 Census and prevailed, the enumeration potentially could have reflected only citizens and legal permanent residents. That is no longer possible, and any remedy now would be both unlawful and imprecise due to the limits of the available data. *See supra* § I.A.1–2. To the extent Plaintiffs seek a redo of the 2020 Census, *see* Compl. at 95 ¶ 4, such relief would also be prejudicial because it would impose a massive burden on Proposed Intervenors, who would need to redo substantial "get out the count" work in the middle of preparations for the 2030 Census. Plaintiffs' unreasonable, inexcusable delay and the resulting prejudice warrants dismissal under laches.

## II. Plaintiffs' Challenges to the 2030 Census Must Be Dismissed

### A. Plaintiffs' APA Claims Fail for Lack of Final Agency Action

Plaintiffs' APA claims fail because they do not identify and cannot yet challenge any "final agency action" reviewable under 5 U.S.C. § 704. The APA does not authorize judicial review of abstract policies, historical practices, or speculative future decisions. Rather, it allows review of agency actions that "consummat[e]" agency decisionmaking and determine "rights or obligations" from which "legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (internal quotation marks omitted). The Complaint does not identify any such action.

At bottom, Plaintiffs challenge what they label a longstanding "Carter Administration Policy" of including noncitizens in census tabulations and apportionment counts. But even taking these allegations at face value, a claimed policy preference or historical practice—untethered to any residence criteria that have actually been put in place for the 2030 Census—cannot amount to final agency action. Plaintiffs do not identify any residence criteria that presently determines how the 2030 Census will be conducted, or how apportionment will ultimately be calculated at the turn of the next decade. Instead, they seek review of a generalized approach allegedly followed across at least *seven* presidential administrations. But that is precisely the kind of "programmatic" challenge the APA does not contemplate. *See Cobell v. Kempthorne*, 455 F.3d 301, 307 (D.C. Cir. 2006) ("Because an on-going program or policy is not . . . a 'final agency action' under the APA, our jurisdiction does not extend to reviewing generalized complaints about agency behavior.") (internal quotation marks omitted).

The only rule the Complaint references—the Final 2020 Census Residence Criteria and Residence Situations, Compl. ¶¶ 7, 58, 109, 111, 127—by its own terms governed only the 2020 Census. The Census Bureau undertakes a new residence-criteria review each decade, and it has not yet finalized the terms for the 2030 Census. Absent a final agency action, Plaintiffs' claims rest on speculation about what an agency might do years from now. But APA claims premised on contingent future agency decisionmaking are unripe, particularly in the census and apportionment context, where judicial review before completion of the statutory process presents a "moving target" and lacks a final agency action to review. *Trump v. New York*, 592 U.S. 125, 132–33 (2020).

Plaintiffs' attempt to package their claims as a challenge to "ongoing" agency conduct also fails. *E.g.*, Compl. ¶¶ 161, 176, 181. Whether "ongoing" or not, agency conduct is not reviewable unless it is reduced to a discrete, final agency action. *See Flue-Cured Tobacco Coop. Stabilization*

*Corp. v. EPA*, 313 F.3d 852, 858 (4th Cir. 2002). The conditions needed for final action are absent where, as here, Plaintiffs' claims depend on future, speculative or unpromulgated census rules and the completion of the apportionment process. *Franklin*, 505 U.S. at 797–99; *see also Texas v. United States*, 523 U.S. 296, 300 (1998) (claim not ripe for adjudication if rests on "contingent future events that may not occur as anticipated") (internal quotation marks omitted).

### B. Plaintiffs Lack Standing to Challenge the 2030 Census

Where, as here, a plaintiff seeks "prospective injunctive relief," the plaintiff must "sufficiently allege 'a real and immediate threat of repeated injury.'" *Mosby v. Ligon*, 418 F.3d 927, 933 (8th Cir. 2005) (quoting *O'Shea v. Littleton*, 414 U.S. 488, 496 (1974)). The threat of future harm cannot be "speculative." *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 381 (2024). It must be "'certainly impending,' or there [must be] a '"substantial risk" that the harm will occur,'" *In re SuperValu, Inc.*, 870 F.3d 763, 769 (8th Cir. 2017); mere "allegations of possible future injury are not sufficient," *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (internal quotation marks and alterations omitted).

Plaintiffs cannot meet this standard for two main reasons. *First*, Plaintiffs plead no factual allegations supporting that the challenged policy—of counting undocumented immigrants for apportionment purposes—will be in effect for the 2030 Census and resulting 2031 Apportionment. Plaintiffs' only allegations concerning whether this policy will remain in place for the census more than four years away is the fact that a couple of Frequently Asked Questions pages on the Census Bureau website include some language that noncitizens are included in resident population counts. *See* Compl. ¶¶ 56, 68–69. But Plaintiffs cite to no actual statute, law, rule, or regulation that details any policy toward counting undocumented immigrants for the 2030 Census. None exists.

In the 2020 Census cycle, for example, the Census Bureau formally set out this policy by

11

issuing the 2020 Residence Criteria, 83 Fed. Reg. 5525. To begin with, starting in May 2015, the Census Bureau considered comment on a precursor rule in place for the 2010 Census. *See* Notice, 2020 Decennial Census Residence Rule and Residence Situations, 80 Fed. Reg. 28950 (May 20, 2015). In February 2018, the Census Bureau promulgated the final rule that applied *exclusively* to the 2020 Census and ended there. *See* 83 Fed. Reg. at 5530 (noting rule was promulgated "[f]or the 2020 Census); *id.* at 5528 (discussing "counting prisoners" "[f]*or the 2020 Census*" (emphasis added)); *id.* at 5529–32 (same, for many other classes of individuals). Plaintiffs admit as much. *See* Compl. ¶ 162 (citing rule "[a]s to the 2020 Census"), ¶¶ 174, 176, 185–86, 195–96, 200 (repeatedly citing the rule as "The Residence Criteria for the 2020 Census").

No such rule has yet been proposed for the 2030 Census. The identity and views of the President, the Secretary of Commerce, and Census Bureau leadership at the end of the decade are unknown, not to mention Congress, which has constitutional authority over the Census. *See* U.S. Const. art. I, § 2, cl. 3. Indeed, as Plaintiffs note, the President supports their position, having once "issued a memorandum" directing the exclusion of undocumented immigrants "from the decennial apportionment base" for the 2020 Census. Compl. ¶ 61 (citing 85 Fed. Reg. 44679 (July 21, 2020)). Yet the Supreme Court held—after the 2020 Census was completed—that a challenge to that Memorandum was "riddled with contingencies and speculation that impede judicial review." *Trump*, 592 U.S. at 131; *see also id.* at 132–33 (noting "[p]re-apportionment litigation always presents a moving target" and that the apportionment process as of the Court's decision on December 18, 2020 "remains at a preliminary stage.") (internal quotation marks omitted). If such speculation precluded review *after* the Decennial Census and mere months before apportionment, then it does so *a fortiori* here, where Plaintiffs sued on January 30, 2026—more than four years before the 2030 enumeration begins and over five years before reapportionment.

In other words, Plaintiffs challenge a non-existent rule that may or may not be set by the next presidential administration. And the implementation of that presently non-existent rule may or may not harm them. This is the definition of an "allegation[] of possible future injury," which is "not sufficient" for standing purposes. *Clapper*, 568 U.S. at 409 (citation modified).

*Second*, even if the Census Bureau had formally adopted a counting rule for the 2020 Census, it is still early to tell whether that rule would harm Plaintiffs at that time. Plaintiffs insist that counting undocumented immigrants and temporary visitors in the 2030 Census "will again rob Missouri . . . of representation in Congress and the Electoral College." Compl. ¶ 70. Yet, as Plaintiffs' own experts repeatedly admit, any attempt "to forecast the apportionment for 2030 . . . is obviously a difficult task, given some data issues and also the possibility that data could shift between now and 2030." Trende Rep. at 6; *see also* Kincaid Rep. at 14 ("Forecasting apportionment for 2030 admittedly involves some imprecision."). This is especially true given that, as noted *supra*, both of Plaintiffs' experts are relying on ACS estimates from 2016–2020—data that is up to a decade old. *See* Kincaid Rep. at 7–13 & fig.1; Trende Rep. at 6.

The Kincaid Report in particular underscores myriad challenges in making this forecast, e.g.: (1) "the shifting methodologies in population estimates by the Census Bureau"; (2) "the large number of noncitizens . . . inflating the population counts"; (3) the Census Bureau changing its methodology in 2024 for counting refugees, making the use of the Census Bureau's 2025 population estimates "problematic" for purposes of "forecast[ing] the 2030 apportionment"; (4) the difficulty of estimating future migration rates and immigration in the U.S. given how vastly different policies have shifted from one presidential administration to another; and (5) the fact that "[t]here are few publicly available sources that empirically estimate the citizen population of the United States out to 2030." Kincaid Rep. at 14–15. On this last point, the Kincaid Report observes

13

that the only "comprehensive, empirical, state-specific" projections come from the Center for Immigration Studies ("CIS"), *id.* at 15—a point that highlights, rather than resolves, the problem. A federal court has described CIS as an "anti-immigrant hate group[]," with "overtly racist, nationalist, and xenophobic origins," and questioned whether its data can be considered reliable or "untainted," given "the racist, anti-immigrant views that they espouse[]." *City of S. Miami v. DeSantis*, 561 F. Supp. 3d 1211, 1228, 1275 (S.D. Fla. 2021), *rev'd on other grounds*, *City of S. Miami v. Governor*, 65 F.4th 631 (11th Cir. 2023); *see also Bellitto v. Snipes*, No. 16-cv-61474, Dkt. No. 244, at 18, 26 (S.D. Fla. Mar. 30, 2018) (criticizing the expert testimony of Steven Camarota, CIS's longtime research director, as "misleading" and "not reliable").

Ultimately, Plaintiffs' claim that they will lose political representation in 2031 is based either on demographic data that will be between 10 and 15 years old, and/or projections that Plaintiffs' expert witnesses themselves admit have significant issues. It is simply too soon to know where undocumented immigrants might be living years from now, and what precise effect, if any, that will have on Plaintiffs' political representation. Even if there were a 2030 policy to challenge here—and there is not—Plaintiffs' injury is speculative and premature.

### C. Plaintiffs' Claims Against the 2030 Census Are Not Ripe

For similar reasons that Plaintiffs lack standing, their claims are unripe. Where the plaintiff alleges some future harm, ripeness and standing issues often "boil down to the same question." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 157 n.5 (2014) (internal quotation marks omitted). Whether an issue of ripeness, *see Trump*, 592 U.S. at 131; *Texas*, 523 U.S. at 300, or standing, *see Susan B. Anthony List*, 573 U.S. at 157 n.5, the court lacks subject matter jurisdiction over the dispute. Here, Plaintiffs' claims are unripe because they are "contingent [on] future events that may not occur as anticipated, or indeed may not occur at all"—namely, the promulgation of a

14

residence rule for the 2030 Census that causes Missouri to lose a congressional seat it would have had under Plaintiffs' preferred rule. *Trump*, 592 U.S. at 131.

## III. The Missouri Attorney General Lacks Statutory Authority to Bring Claims on Behalf of the Individual Plaintiffs.

The Missouri Attorney General purports to represent not only the State of Missouri but also four individual Missouri residents. She lacks authority to do so.

Missouri law authorizes the Attorney General to bring suits "in the name and on the behalf of the state" to protect the State's interests. *See* Mo. Rev. Stat. § 27.060. As the Missouri Supreme Court has long made clear, however, the state Attorney General lacks authority to bring claims on behalf of individual citizens. *State ex rel. Barker v. Chicago & A.R. Co.*, 178 S.W. 129, 136 (Mo. 1915); *see also State ex inf. McKittrick v. Am. Colony Ins. Co.*, 80 S.W.2d 876, 890 (Mo. 1934).[5]

Because the Attorney General lacks authority to represent the Individual Plaintiffs, her attempt to bring claims on their behalf is ultra vires and "void *ab initio*." *See Collins v. Yellen*, 594 U.S. 220, 257 (2021). This Court should therefore exercise its "power to inquire by what authority an attorney of that court undertakes to sue or to defend, in the name of another" and dismiss their claims. *Pueblo of Santa Rosa v. Fall*, 273 U.S. 315, 319 (1927).

### CONCLUSION

For the foregoing reasons, the Complaint should be dismissed.

---

[5] The Missouri Attorney General cannot overcome this defect by invoking the *parens patriae* doctrine. *See* Compl. ¶ 21. "In a *parens patriae* action, the state sues in its sovereign capacity *and is the named plaintiff in the lawsuit*." Jason Mazzone & Stephen Rushin, *State Attorneys General as Agents of Police Reform*, 69 Duke L.J. 999, 1034 (2020) (emphasis added); *see also, e.g.*, *Missouri v. Starbucks Corp.*, No. 4:25-cv-165, 2026 WL 309714, *11–15 (E.D. Mo. Feb. 5, 2026). Here, by contrast, the Missouri Attorney General purports to bring suit not only in the name of the State but also in the name of Individual Plaintiffs. In any event, "States do not have standing as *parens patriae* to bring an action against the Federal Government." *Murthy v. Missouri*, 603 U.S. 43, 76 (2024) (internal quotation marks omitted).

Dated: February 9, 2026

Respectfully submitted,

/s/ Gillian R. Wilcox
Gillian R. Wilcox #61278(MO)
Jason A. Orr #56607(MO)
ACLU OF MISSOURI FOUNDATION
406 West 34th Street, Ste. 420
Kansas City, MO 64111
Phone: (816) 470-9938
Fax: (314) 652-3112
gwilcox@aclu-mo.org
jorr@aclu-mo.org

Kristin M. Mulvey #705688(MA)/#76060(MO)
Jonathan D. Schmid #74360(MO)
ACLU of Missouri Foundation
906 Olive Street, Suite 1130
St. Louis, MO 63101
Phone: (314) 652-3114
kmulvey@aclu-mo.org
jschmid@aclu-mo.org

John A. Freedman* #453075(DC)
Elisabeth S. Theodore* #1021029(DC)
ARNOLD & PORTER KAYE
SCHOLER LLP
601 Massachusetts Ave., N.W.
Washington, D.C. 20001
Phone: (202) 942-5000
Fax: (202) 942-5999
john.freedman@arnoldporter.com
elisabeth.theodore@arnoldporter.com

Niyati Shah* #1659560(DC)
ASIAN AMERICANS ADVANCING
JUSTICE – AAJC
1620 L Street, NW, Suite 1050
Washington, D.C. 20036
Phone: (202) 296-2300
Fax: (202) 296-2318
nshah@advancingjustice-aajc.org

Grayce Zelphin* #279112(CA)
ACLU FOUNDATION OF
NORTHERN CALIFORNIA
39 Drumm Street
San Francisco, CA 94111
Phone: (415) 621-2493
Fax: (415) 255-1478

/s/ Sophia Lin Lakin
Sophia Lin Lakin* #5182076(NY)
Davin Rosborough* #4926895(NY)
Jonathan Topaz* #5671151(NY)
Ethan Herenstein* #5743034(NY)
William Hughes* #5867346(NY)
Theresa J. Lee* #5022769(NY)
Ming Cheung* #5647763(NY)
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
125 Broad St., 18th Floor
New York, NY 10004
Phone: (212) 549-2500
Fax: (332) 234-9285
slakin@aclu.org
drosborough@aclu.org
jtopaz@aclu.org
eherenstein@aclu.org
whughes@aclu.org
tlee@aclu.org
mcheung@aclu.org

Adriel I. Cepeda Derieux* #4919163(NY)
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
915 15th St. NW
Washington, DC 20001
Phone: (740) 632-0671
acepedaderieux@aclu.org

Perry Grossman* #5382106(NY)
NEW YORK CIVIL LIBERTIES UNION
FOUNDATION
125 Broad St.
New York, NY 10004
Phone: 212.607.3347
Fax: (212) 607-3318
pgrossman@nyclu.org

Ashley Harris* #24123238(TX)
Thomas Buser-Clancy* #24078344(TX)
ACLU FOUNDATION OF
TEXAS, INC.
1018 Preston St.
Houston, TX 77002
Phone: (713) 942-8146
Fax: (713) 942-8966
aharris@aclutx.org

16

gzelphin@aclunc.org

tbuser-clancy@aclutx.org

Julia A. Gomez* #316270(CA)
Peter J. Eliasberg* #189110(CA)
ACLU FOUNDATION OF SOUTHERN
CALIFORNIA
PO Box 811370
Los Angeles, CA 90081
Phone: (213) 977-9500
Fax: (213) 915-0219
jgomez@aclusocal.org
peliasberg@aclusocal.org

*applications for admission pro hac vice
forthcoming

*Counsel for Proposed Intervenors OCA-Asian
Pacific American Advocates, Make the Road
New York, New York Immigration Coalition,
and FIEL Houston*